COALITION TO SAVE OUR CHILDREN, (formerly Brenda Evans, et al.), Plaintiffs,

v.

STATE BOARD OF EDUCATION OF the STATE OF DELAWARE, The Board of Education of the Brandywine School District, The Board of Education of the Christina School District, The Board of Education of the Colonial School District, and the Board of Education of the Red Clay Consolidated School District (formerly Madeline Buchanan, et al.), Defendants.

Civ. A. No. 1816–1822 MMS.

United States District Court, D. Delaware.

Feb. 1, 1991.

Irving Morris, and Kevin Gross, of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, Del., of counsel: William L. Taylor, Washington, D.C., and Leonard L. Williams, Wilmington, Del., for plaintiffs.

Bertram S. Halberstadt, of Wier & Halberstadt, Wilmington, Del., for Intervening Hispanic plaintiffs.

David H. Williams, and Barbara D. Crowell, of Morris, James, Hitchens & Williams, Wilmington, Del., for defendants Brandywine School Dist., Christina School Dist., and Colonial School Dist.

Alfred J. D'Angelo, Jr., and Judith E. Harris, of Pepper, Hamilton & Scheetz, Wilmington, Del., for defendant Red Clay School Dist.

Mason E. Turner, Jr., of Prickett, Jones, Elliott, Kristol & Schnee, and Marcia Rees, Deputy Atty. Gen., Dep. of Justice, Wilmington, Del., for defendant State Bd. of Educ.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

This desegregation litigation traces its origins to 1956, when suit was filed as an outgrowth of the landmark decisions of the United States Supreme Court in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*) and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II*). The case was reactivated in 1971. In the mid–1970's, a three-judge court determined that the Wilmington schools, which had been *de jure* black schools prior to *Brown I*, continued to be racially identifiable and that Wilmington's dual school system had not been eliminated. *Evans v. Buchanan*, 379 F.Supp. 1218, 1223 (D.Del.1974). In a subsequent opinion, the three-judge court found inter-district *de jure* segregation involving eleven school districts in northern New Castle County. *Evans v. Buchanan*, 393 F.Supp. 428, 438 (D.Del.), *aff'd*, 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975).

After three weeks of evidentiary hearings, the three-judge court rejected remedial plans proposed by the parties and ordered the schools in the segregated districts to be desegregated and reorganized. The responsibility for implementing the court's order was given to the State authorities. *Evans v. Buchanan*, 416 F.Supp. 328 (D.Del.1976), *aff'd*, 555 F.2d 373 (3d Cir.), *cert. denied*, 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 160 (1977).

Upon the State's failure to submit a plan which would effectively eliminate the dual school system and the vestiges of *de jure* segregation, this court entered an order ("1978 order") consolidating the affected school districts into a single district (the "desegregated area"). After considering several desegregation plans, the court addressed pupil assignment in the 1978 order by requiring all students to attend schools in the former predominantly white districts for nine years and schools in the former predominantly black districts (the "City schools") for a minimum of three consecutive years ("9–3"). The court also required that a full 1–12 grade span be maintained within the City of Wilmington (the "City") and that at least one of the three former predominantly black high schools be used as a 10–12 grade center. *Evans v. Buchanan*, 447 F.Supp. 982 (D.Del.), *aff'd*, 582 F.2d 750 (3d Cir.1978), *cert. denied*, 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980) (cited hereinafter as *"Evans 1978"*).

The court chose the 9–3 plan over a 10–2 plan favored by State authorities because the 9–3 plan minimized the burden on minority students both in terms of the number of years those students would be transported away from neighborhood schools and in terms of the number of city schools which could remain open under each plan: [1]

What is open to question is whether a plan to provide a unitary racially non-discriminatory school system can, without reciting any underlying justification, transport black children a greater number of years than is necessary to accom-

---

1. Minimization of the impact upon the victims of desegregation involved both minimizing the number of years minority students would be bussed away from their neighborhood schools and minimizing the number of City schools which would be closed as a result of the consoli- dation of the eleven school districts. Building capacity constraints in the former predominantly black districts precluded placing all students in City schools for more than three years. *See Evans 1978*, 447 F.Supp. at 1005–08.

plish the goal and simultaneously eliminate most grades in predominantly black districts when a practical alternative appears to exist. The answer arising out of principles of equity is no. At the very least, fundamental fairness demands that decisions that have the effect of maximizing the burden on black students be supported by justifications of a non-racial nature.

*Evans 1978*, 447 F.Supp. at 1004 (footnote omitted). By adopting the 9–3 plan, the court attempted to ensure that the class of minority students whose rights had been violated by previous state-supported segregation would not bear the full burden of the remedy.

In 1981, after the Delaware General Assembly passed legislation empowering the Delaware State Board of Education ("State Board") to ensure compliance with the parameters set forth in the 1978 order, this court approved division of the single consolidated district into four component school districts.[2] *Evans v. Buchanan*, 512 F.Supp. 839 (D.Del.1981) (cited hereinafter as *"Evans 1981"*). Defendant Red Clay Consolidated School District ("Red Clay District" or "the District") is one of the four component districts. In May 1989, defendant State Board suggested to the Red Clay District that it bring the racial composition of its student populations at each District school to within $+/-$ 10% of the minority percentages for each grade level in the District by Fall 1991, a goal which was adopted by the Red Clay Consolidated School Board ("Red Clay Board" or "the Board"). PX 1–47.[3]

After a series of delays, the Red Clay Board submitted to the State Board on or about March 30, 1990 a plan to achieve compliance with the State Board's request. The plan described a fully developed student reassignment component ("mixed feeder plan") and a "choice" or "magnet school" component to be developed and submitted to the State Board by September 1, 1990. The Plan contemplated implementation of both components in September 1991. PX–3.

The Coalition to Save Our Children (the "Coalition" or "plaintiffs"), representative of the black plaintiff class in this case, filed a motion in May 1990 seeking a court order directing implementation of the student reassignment component in September 1990. The court conducted a bench trial on June 12–15, 1990, in which the Plaintiffs presented substantial evidence that the feeder patterns then in place, although technically in compliance with 9–3, had not resulted in progress toward eradication of vestiges of past segregation. At trial, the Red Clay Board admitted that the mixed feeder plan could be implemented at the high school level with relative ease but that implementation at grades K–8 required much planning. The Board urged the impracticalities of implementing the mixed feeder plan on short notice. Both the Red Clay Board and the State Board assured the court that changes would be implemented in September 1991 to remedy the racial disparities among the Red Clay schools.

Upon the conclusion of the bench trial and briefing by the parties, the court denied plaintiffs' motion in an opinion and order issued on July 2, 1990 ("July 1990 opinion"). *Coalition to Save Our Children v. Buchanan*, 744 F.Supp. 582 (D.Del. 1990). The court found that the Red Clay Board's technical compliance with the 9–3 plan had not resulted in progress toward full racial desegregation of the Red Clay schools. In the July 1990 opinion, the

---

**2.** The court also modified the 9–3 plan slightly, ordering that students from the former predominantly black districts be assigned to schools in the former predominantly white districts "for a maximum of nine years" and that students attend the City schools for "at least three consecutive years." Supplemental Order Clarifying Prior Decisions (March 25, 1981) (Dkt. 1034).

**3.** Citation to the record is as follows:

"PX—__"—exhibit submitted by the Coalition to Save Our Children
"SB—__"—exhibit submitted by defendant Delaware State Board of Education
"RC—__"—exhibit submitted by defendant Red Clay Consolidated School District
"Tr.—__"—citation to transcript of the hearing conducted January 2–11, 1991 (Dkt. __).
Testimony of witnesses is indicated by the last name of the witness in parentheses.

court addressed the contention of the Red Clay Board that, so long as the Board technically complied with the 1978 and 1981 orders, the court could not order further remedial measures. The court held that if compliance with the 1978 and 1981 orders does not result in progress toward the eradication of the vestiges of prior segregation "root and branch," the court can and should order further remedial actions.

The court also stated in July 1990 and in previous opinions that it would not order remedial measures over the objection of educational authorities in the absence of a finding that those authorities had abdicated their responsibility to eradicate the remnants of *de jure* segregation and to return the District to a state of full compliance with the Equal Protection Clause of the United States Constitution. Although the court did not find in July 1990 that the Red Clay Board had abdicated its responsibilities under the desegregation orders, it did state that "[o]bviously, the six-year history of failure to develop and implement a satisfactory reassignment plan could well be considered an abdication of responsibility by the State and local education authorities if it appeared there would not be implementation in September 1991." *Coalition to Save Our Children,* 744 F.Supp. at 593.

From September 1, 1990—December 14, 1990, the Red Clay Board submitted to the State Board for its approval a series of proposals regarding implementation in September 1991 of what has become known to all participants in this litigation as Red Clay's "CHOICE" plan. At least two of these submissions were presented in the form of applications to the Title VII Magnet Schools Assistance Program for funding in the amount of $6.07 million dollars for implementation of the CHOICE plan ("magnet school applications"). In order to make CHOICE available to all students in the District, it is necessary for the Red Clay Board to obtain modification of the 9–3 requirement. On December 20, 1990, the State Board issued an order ("State Board order") approving the CHOICE proposal conditioned upon the Red Clay Board fulfilling certain requirements spelled out in that order. SB–23–6. An eight-day

hearing held January 2–11, 1991 resulted in part from the Red Clay Board's motion seeking this court's approval for modification of the 9–3 provisions of the remedial orders to enable Red Clay to implement the CHOICE plan. For the reasons stated herein, the modifications of the court's prior orders necessary to implement the CHOICE proposal will be granted, subject, however, to certain conditions and restrictions detailed in the Order attached as Appendix A to this Opinion.

The hearing was also necessitated by a motion filed by the Coalition. The plaintiffs, fearing that further delay would result in the same impracticalities which convinced the court to deny their May 1990 motion, have filed a motion seeking a court order directing the Red Clay Board to implement the mixed feeder component of the March 1990 plan in September 1991. The Order issued by the court will address in part the concerns raised by the plaintiffs. Except to the extent that the Order addresses these concerns, however, plaintiffs' motion will be denied.

## FINDINGS OF FACT

A. *The Need For Further Changes in the Red Clay School District in Order for it to Progress Toward Eradication of the Remnants of Prior Segregation "Root and Branch"*

1. The evidence adduced during the hearings conducted January 2–11, 1991 and June 12–15, 1990 demonstrates that the 9–3 plan, as implemented by the Red Clay Board, has not resulted in eradication of the remnants of prior segregation "root and branch" from the District and that the District has not achieved the greatest degree of desegregation practicable under the circumstances.

2. On September 16, 1988, the State Board notified the Red Clay Board that it had conducted an overarching review of compliance with the desegregation orders by the four school districts in the desegregated area. The State Board's review included a review of revenue, facilities, curriculum, transportation, extracurricular activities, student distribution, staff distribu-

tion, special education, dropout rates, achievement testing, and suspensions, expulsions and arrests. The State Board concluded that it was sufficiently comfortable with the overall compliance patterns of the Brandywine, Colonial, and Christina school districts to support a motion by those districts for a declaration of unitary status. The State Board notified the Red Clay Board that the State Board did not feel sufficiently comfortable with the compliance of Red Clay to offer similar support to the Red Clay District. SB–7 (letter from Charles E. Welch, then-President of the State Board of Education to Donald F. Schneck, then-President of the Red Clay School Board (September 16, 1988)).

3. As of September 1989, total enrollment in the Red Clay School District at grades 1–12 consisted of 34.71% minority [4] students and 62.78% nonminority.[5] The District has admitted that "six of the District's 19 schools ... were outside of the [District's] plus or minus 10 percent goal...." Opening Brief of the Red Clay Board of Education at 28 (Dkt. 1305). By the District's own admission, then, nearly one-third of its schools are currently outside the desegregation target it has set for itself. For example, as of September 1989, the Baltz Elementary School had an enrollment of approximately 52.61% minority students and 47.09% nonminority. The Richardson Park Elementary School had 54.24% minority and 45.21% nonminority enrollment. The Conrad Middle School had an enrollment of 47.27% minority and 52.16% nonminority, and the Wilmington High School had an enrollment of 54.85% minority and 44.34% nonminority. By contrast, the H.B. duPont Middle School had an enrollment of 19.22% minority and 74.83% nonminority, and the A.I. duPont High School had an enrollment of 19.33% minority and 75.86% nonminority. PX–41 at Exh. 1.

4. Such racial disparity in the schools can result in racial isolation at the class-room level. For example, as of October 29, 1990, of the 225 classes at Wilmington High School, a school in which 54.85% of the population was minority in school year 1989–90, 53, or nearly one-fourth, of the classes contain greater than 49% African-American students, while only 2 classes, or less than 1%, had enrollments which were less than 10% African–American. By contrast, of the 395 classes at A.I. duPont High School, which had only 19.23% minority enrollment in school year 1989–90, only 8, or roughly 2%, had greater than 49% African–American enrollment, while 159, or 40% had an enrollment that is less than 10% African–American as of October 29, 1990. PX–84.

5. Racial disparity such as that demonstrated above reverberates through the performance of children at the various schools. For example, the basic battery test scores of minority children remain well below those of nonminority children at most, if not all, of the Red Clay schools. See PX–80–82. In its application for federal funding, the Red Clay District detailed the disparate impact that the Red Clay schools have had on minority children in terms of test scores. "While scores of 11th grade Red Clay students on the statewide standardized achievement test are the highest of all Delaware school districts, the scores differ across the four high schools within Red Clay and are lowest for minority students.... Moreover, the score differences between minority students and nonminority students differ in many cases by 20 NCE points or more.... This discrepancy exists in all grade levels...." RC–30 at 18–19.

6. Moreover, both minority and nonminority students in schools with a disproportionately large percentage of minority students appear to perform at a lower level. See PX–82 (comparing test scores of students at Wilmington High School with those of the other three high schools); PX–81 (comparing test scores of eighth grade

---

[4]. For purposes of this opinion, minority students are those students who are African–American (27.48%) or Hispanic (7.23%).

[5]. The remaining students are American Indian (0.044) or Asian (2.47%). Asian students have never been considered part of the minority for purposes of this litigation. See PX–1–17 at 2.

students at Conrad Middle School with those of eighth graders at the other Red Clay middle schools); PX–41 at Exh. 5 (comparing college matriculation at the four high schools).

7. According to the Red Clay District, "the percent of students enrolled in special education who are minority [is] 58.4 percent of all special education students in the district. There are 16 schools in the district where 50 percent or more of the special education students are minorities." RC–30 at 16.

8. The district has also admitted that there is a high rate of absenteeism and suspension among its minority students. RC–30 at 15 & 17.

9. In sum, although the current attendance configurations in the Red Clay school district comply with the 9–3 plan, technical compliance with the 9–3 plan alone has not resulted in the eradication of the vestiges of prior segregation. Maintenance of the status quo will not enable the District to make the transition to the greatest degree of desegregation practicable under the circumstances.

### B. Proposed Changes in the Red Clay Feeder Patterns

10. Plaintiffs filed a motion requesting the court to enter an order directing the State Board and the Red Clay Board to revise the Red Clay District feeder patterns to eliminate racial disparities and to meet with plaintiffs to devise a plan for addressing problems of minority suspensions, absenteeism, low achievement scores, etc. Plaintiffs' Motion (Dkt. 1294).

11. Evidence at the January 2–11, 1991 hearing as to revision of feeder patterns centered around the feeder pattern changes proposed by the District on March 30, 1990. At this point, some clarification of terminology is necessary. Since they were first proposed on March 30, 1990, the proposed changes have been discussed as two plans, rather than one. The proposed changes in feeder patterns for grades K–8 have become known as "Mixed Feeder I." The changes in assignment for grades 9–12 are denominated "Mixed Feeder II."

12. The Red Clay Board has decided to implement Mixed Feeder I, or the K–8 feeder pattern changes, along with implementation of their proposed CHOICE plan. Under Mixed Feeder I, certain groups of students who under current assignment patterns would spend their three years in a City school at Wilmington High School during grades 9–12 would instead spend grades 1–3 in the City. Consequently, implementation of Mixed Feeder I would require a temporary deviation from the 9–3 plan for those Red Clay students who enter grades 2 and above in school year 1991–92 and who reside in the two city census grids numbered 104/358 and 110/360 where the assignment to schools in the former predominantly black districts would be changed from grades 9–12 to grades 1–3.

13. The deviations requested for Mixed Feeder I will affect a total of approximately 857 students who will spend less than three years in the City schools. SB–23–1; Tr. 799 (Spartz).

14. The Red Clay Board has declined to implement feeder pattern changes for grades 9–12 (Mixed Feeder II) because it intends to implement its CHOICE plan instead.

15. Apparently, no deviations from the 9–3 plan would occur if Mixed Feeder II were to be implemented other than those necessitated by implementation of Mixed Feeder I as set forth at ¶ 12 above.

### C. The CHOICE Proposal

16. The State Board urges the court to consider the entire CHOICE plan as consisting of the March 30, 1990 submission, PX–3, the September 1, 1990 submission, RC–18, the letter of Dr. Green to Dr. Keene dated December 14, 1990, RC–29, and the various explanations by Red Clay officials during the January 2–11, 1990 hearing, as well as the final application submitted to the federal Magnet Schools Assistance Program on December 14, 1990, entitled "A Proposal to Eliminate Racial Isolation by the Implementation of a Voluntary Desegregation Plan Using Magnet Programs," RC–30.

17.   The March 30, 1990 and September 1, 1990 submissions, however, are prior proposals which supposedly have been revised and polished to produce the December 14, 1990 application.  The December 14, 1990 letter and the explanations given at the hearing represent the views and assurances of individual Red Clay officials who may or may not be in a position to carry out their assurances in the future.  Tr. 1724–25 (Bennett) ("[G]iven the transitory nature of school board members or at least the fact that school board members are elected to office, they leave office, and even more directly the transitory nature of school leadership, school superintendents . . . unless there are written components of a plan that in turn the Court can order . . . the individuals who embroider upon a plan and offer to the Court commitments and additional statements on behalf of what the plan really means, the Court may well find those individuals simply no longer in a position to enforce the Court's orders and understanding.").

18.   Consequently, the court will limit its consideration of the CHOICE plan to the proposals set forth in the final magnet school application, RC–30, as modified by the State Board's order of December 20, 1990, SB–6.

19.   The court will first describe the plan that has been proposed for grades 9–12.  The CHOICE plan at the high school level consists of two components: a "magnet" component and a student assignment or "controlled choice" component.

20.   The "magnet" component consists of programmatic enhancements at two of the four Red Clay high schools.

a.   At Wilmington High School, a former predominantly black school, the District proposes to offer three specialized programs: an Academy of Banking, Finance and Office Technology, RC–30 at 117–21, an Academy of Math and Science, RC–30 at 122–25, and an Academy of Engineering and Technology, RC–30 at 126–29.  In addition, all Wilmington High School students will participate in a core curriculum which satisfies the minimum standards of the Department of Public Instruction.  The method of instruction for the core courses will be dictated by the "RE: Learning" philosophy, an instructional methodology focusing on team teaching, student evaluation through exhibits rather than traditional written tests, and active student participation in the learning process.  RC–30 at 112–16;  Red Clay Post–Trial Brief at 30 n. 18 (Dkt. 1336).

b.   The District also proposes to offer three specialized curricula at the Dickinson High School, a former predominantly white school: a School of Communication, RC–30 at 99–102, a School for the Creative and Performing Arts, RC–30 at 103–07, and a School of Health Professions, RC–30 at 108–10.   Dickinson High School students will participate in a core curriculum meeting the standards of the Department of Public Instruction which will utilize the "Paideia" philosophy, an instructional strategy symbolized by active participation between student and teacher involving extensive classroom discussion and coaching labs in which students interact with a coach.  RC–30 at 95–98;  Red Clay Post–Trial Brief at 30 n. 19.

c.   The two remaining high schools, A.I. duPont High School and Thomas McKean High School, will continue to offer traditional comprehensive high school curricula.

21.   The student assignment or "controlled choice" component is a method of student assignment ostensibly designed to evenly distribute enrollment among the four high schools and to bring the populations of each of the high schools to within $+/- $ 10% of the racial distribution of the District average for the grades affected.  RC–30 at 1.

22.   The plan proposes to achieve these objectives by setting numerical target ranges at each school.  For example, the District has projected that District-wide minority enrollment for ninth graders in the school year 1991–92 will be 35.6%.  The target ninth grade enrollment at Dickinson High School is 226.  In order for the District to achieve its goal of $+/- $ 10%, between 58 and 103 minority and between 123 and 168 nonminority ninth grade students

must be assigned to Dickinson. *See* RC–30 at 33–34.

23. The proposed enrollment procedures would work as follows. Students would complete enrollment forms indicating four choices among the eight available high school programs (the six magnet programs at Wilmington and Dickinson High Schools plus the two comprehensive curricula at A.I. duPont and McKean High Schools) in order of priority. The District would assign as many students as possible to their first choice programs based upon factors of priority of choice, program capacity, racial balance, whether the student already has a sibling attending the school which houses the program, and proximity of residence to the school which houses the program. If a particular program is oversubscribed, meaning that the number of applicants who satisfy the controlling factors exceeds program capacity, then a computer would assign students to that program by random selection, keeping the assignment within the racial targets. Those students who do not receive their first choice program would then repeat the process for their second, third, and fourth choices. They would also be put on a waiting list for their first choice, the order of which would be determined by random selection. RC–30 at 57–60.

24. Implementation of the CHOICE proposal requires what has been termed in Red Clay's motion a "permanent" modification of the 9–3 plan that would permit:

> a permanent exemption from the requirement that our "suburban" students spend at least three years in a city school for those students who will not be assigned to a city school for at least three years in grades 1 through 8 and who thereafter select a CHOICE Plan program based at one of the District's suburban high schools.

6. The motion also requests a modification which would exempt "city students" who choose Wilmington High School from the requirement that they spend 9 years in the suburban schools. As noted by Dr. Spartz during the hearing, the 9–3 plan was modified in 1981 to provide that students from the former predominantly black districts be assigned to schools in the former

Motion of the Red Clay Board (Dkt. 1304).[6] The word "permanent" is somewhat misleading and was the subject of much debate during the hearing. Red Clay's motion is clearly tied to operation of the CHOICE program and would not exempt the Red Clay District from the 9–3 requirement in the event the CHOICE program was discontinued or never implemented. The State Board apparently recognized this limitation when it eliminated the term "permanent" from the modification it granted Red Clay. SB–32–6 (Order of the State Board).

25. Implementation of the CHOICE plan at the high school level could potentially cause between 25.4% and 32% of the District population, depending upon whether one included in the District population kindergarten students and students who leave the District schools prior to ninth grade, to fail to attend a City school at any time during their twelve years of public schooling. Tr. 874–887 (Spartz). Phrased differently, an estimated 830 students who would have been assigned to Wilmington High School under the mixed feeder plans at any one time would not have spent any time in a City school during grades 1–8. If all 830 of these students chose and received a high school assignment other than Wilmington High School, they would spend no time in a City school. SB–23–3. Of course, some portion of those 830 students could choose one of the programs housed at Wilmington High School so that the actual number of high school students at any given time who would never have attended a City School will probably be somewhat less than 830. In fact, the State Board has noted that many of those 830 students live in an area which is in close proximity to Wilmington High School, so that the controlling factors used in assigning students would give these students a preference over other students of the same race if

predominantly white districts "for a maximum of nine years." Supplemental Order Clarifying Prior Decisions (March 25, 1981) (Dkt. 1034). Consequently, Red Clay does not need the court's permission for CHOICE options which would cause City students to spend more than 3 years in the City schools.

they chose to attend one of the programs at Wilmington High School. Tr. 819–23 (Spartz).

26. Much testimony has been offered both in favor of and opposing the CHOICE plan. The testimony in favor of the plan has largely been related to its potential, if implemented as designed, to eradicate the racial imbalances in the Red Clay high schools and to provide enhanced educational opportunities.

27. The staff at the Department of Public Instruction concluded upon completion of an evaluation of the plan that it offered a potential for enriched secondary education:

> In summary, in looking at the magnet proposal from a programmatic perspective and accepting it as a concept, it is hard to make a strident case against the proposed concept. The actual test of its validity will come when the course guides are written, the staff is re-trained, when the students select or are selected for the programs, when the students are scheduled into the classes, and when the educational outcomes can be assessed. As stated previously, the concept outlined in the magnet application, which is more fully developed than all reports previously published by Red Clay Consolidated School District, has the potential to offer curricula and pedagogy within an established framework that could be an educational improvement over a conventional program found in a typical high school. Moreover, it appears to offer some scheduling opportunities that will increase the chances of programs and classrooms to be non-racially identifiable.

SB–23–8 at 3–4 (Analysis of the Programmatic Aspect of Red Clay's Magnet Application); *see generally* Tr. 961–83 (Schiller).

28. The plan was also praised as providing "fairness" in terms of equal opportunity for all students to participate in the magnet programs through the lottery system of assignment, RC–29, and through the intention to eliminate "tracking," the prac-

tice of programming students into courses based upon ability and past performance so that students may participate regardless of their previous academic achievements. Tr. 965–66 (Schiller).

29. Red Clay's expert, Dr. Charles Glenn, testified that the plan would enhance education by "permit[ting] a school to concentrate on serving some students extremely well rather than having to try to meet the needs of every kind of interest with some kind of lowest common denominator." Tr. 319 (Glenn).

30. Dr. Glenn also testified that the CHOICE method of student assignment would create an atmosphere wherein the four high schools would compete for students, providing "an extremely powerful motivator toward reform and improvement in general." Tr. 272 (Glenn).

31. The proposed educational enhancements appear to be beneficial. The plan proposes use of small group learning sessions to give some students more personalized teaching, as well as peer tutoring and interaction. RC–30 at 160. If the District obtains the necessary funding, it plans to obtain a great deal of additional equipment such as a computer lab and specialized equipment for each of the magnet programs. RC–30 at 164–65.

32. The literature regarding magnet schools and choice programs has largely been favorable. *See, e.g.,* SB–20; SB–21.

33. The evidence opposing the plan has centered on five main themes: its dependence on substantial outside funding for implementation, the trustworthiness of the Red Clay Board to implement the plan in a nondiscriminatory fashion, the plan's lack of an explicit "commitment" to its enrollment and racial balance "targets," the plan's ability to remedy the racial disparities in dropouts, suspensions, attendance, assignments to special education classes, test scores, and matriculation to college,[7] and the plan's failure to address certain contingencies which may or may not be

---

7. The plaintiffs have denominated this particular aspect of the case the "Substantive Problems." For the sake of simplicity and brevity,

the court will hereinafter adopt the same shorthand terminology.

likely to arise. With the exception of the issue of the Red Clay Board's good faith, which will be addressed in the next section, the court will set forth the evidence presented as to each of these criticisms.

34. The District's application for funding from the Magnet Schools Assistance Program seeks a total of $6.07 million over a two-year period. RC–30 at 166.

35. Dr. Green, the Superintendent of the Red Clay Consolidated School District, has stated that the District's current budget, consisting of state and local funds, supports its traditional K–12 curriculum, and outside funding will be necessary to implement the educational enhancements, or magnet component, of the CHOICE proposal. SB–23–12 (letter from Dr. Green to Dr. Keene). Consequently, CHOICE as proposed is dependent upon a grant of funds from the federal Magnet Schools Assistance Program. Tr. 733–34 (Green); RC–24.

36. For school year 1990–91, the Magnet Schools Assistance Program approved partial or complete funding for only 54 of the 144 applicants.[8] Tr. 1328–29 (Fine); SB–24.

37. Although the Red Clay witnesses have urged the possibility of obtaining private funding in the event the District does not receive a grant from the federal program, the District has thus far failed to formally apply to any private foundations or donors, Tr. 197–98 (Ames); Tr. 620 (Allen); Tr. 1671–77 (Green), and is only in the very preliminary stages of an investigation into the availability of such private funding. Tr. 1671–77 (Green) (only two letters of inquiry have been written to date).

38. The State Board has not given the District carte blanche to implement any version of CHOICE that it finds itself able to implement. Rather, the CHOICE plan approved by the State Board was the plan presented in the December 14, 1990 application as fully implemented and funded. Tr. 1173 (Fine); SB–23–6 at ¶ 1.

39. As the plan stood prior to issuance of the State Board's December 20, 1990 order, remediation of the racial disparities at the Red Clay high schools was dependent upon the receipt of federal funds.

40. Despite a request from the State Board that it submit a backup plan, the Red Clay Board voted not to submit a backup plan. *See infra.* The Red Clay Board insisted a backup plan was unnecessary because the CHOICE proposal as written would guarantee racial balance. As the State Board properly recognized, however, a backup plan is necessary to remedy the racial disparities at the Red Clay high schools by September 1991 if funding does not become available.

41. Even if the CHOICE plan were to be funded and implemented, it contains substantial gaps. The plan fails to address squarely several contingencies. It is unclear from the plan what would happen if a student did not receive one of his four choices, if a student or parent failed to fill out a CHOICE enrollment form, if a student decided at some point that his pro-

---

**8.** Plaintiffs argue that even if the District were to receive full federal funding, such funding would be received too late (May or June 1991) for the District to implement adequately the CHOICE plan in September 1991. The court notes, however, that one of the provisos of the Magnet Schools Assistance Program is that the funds awarded be spent in the year granted. The Magnet Schools Assistance Program notifies all funding recipients at the same time. Consequently, all school districts which apply for federal funding to implement magnet school programs face the same dilemma, in terms of timing, as Red Clay. In addition, the State Board's December 20, 1990 order requires the District to begin implementation of both CHOICE and the backup well before the District expects to be notified about federal funding.

Plaintiffs also point to the Red Clay District's arguments at the June 12–15, 1990 hearing that insufficient time remained at the time of that hearing for the District to implement Mixed Feeder I and II in September 1990. The court notes that at that hearing, Red Clay conceded that the high school reassignments, Mixed Feeder II, could be implemented with relative ease. The District asserted that it was the Mixed Feeder I K–8 reassignments which required a degree of preparation. The District is apparently moving forward with Mixed Feeder I regardless of CHOICE. Implementation of CHOICE in September 1991 would not require further planning and preparation at grades K–8.

gram assignment was not meeting his needs and desired to change programs, if a student changed his mind after submitting his selection forms, and how students who enter the District mid-year will be assigned. Tr. 1728 (Bennett).

42. The plan was also considered deficient by several witnesses because it failed to set minimum enrollments at the four high schools. Although the plan expressly states that one of its objectives is equivalent enrollment at the four high schools, there is no explicit commitment to this objective beyond certain statements about the number of minority and nonminority students who "will" be enrolled at the various schools. *E.g.*, RC–30 at 33 (based on a "target" enrollment of 226 ninth graders at Dickinson, "admission *will* be controlled to achieve the range of 58 to 103 minority students and 123 to 168 nonminority students") (emphasis added). Without a commitment to minimum enrollment, the District creates the possibility of the "incredible shrinking school." Tr. 1746 (Bennett). The District itself has noted that a school's population may decline to the point that the school becomes ineffective. RC–30 at 39; *see also* Tr. 1747–48 (Bennett) (schools with low enrollment tend to offer fewer courses and less breadth of curriculum). Thus, one flaw in the CHOICE plan is its failure to make an express commitment to minimum enrollments at the four high schools. A commitment to minimum enrollments should not be buried in statements concerning racial disparities. Although the District cannot know for certain the number of students who will enroll in the District next September, there is nothing preventing it from making a commitment that the enrollment at each high school shall not fall below 25% of the District total at each grade level.

43. The CHOICE plan also fails to explain clearly what would result if, because of program capacity and the other factors taken into account in the assignment process, a student failed to receive any of his or her four choices. Although Red Clay witnesses stated that in such a situation that student would be assigned to a program with available capacity, this is not spelled out in the December 14, 1990 application itself. RC–30 generally; Tr. 1591 (Green); Tr. 1738–40 (Bennett). Moreover, this feature has not been explained to the parents in any Red Clay communication concerning the CHOICE program. Tr. 1590–93 (Green). The only communication which even comes close to informing parents that their children might be mandatorily assigned even under the CHOICE proposal is RC–17, which contains the statement:

> Students will be notified of their program assignments in March, 1991. A waiting list will be established for each program in case openings develop later. Every effort will be made to see that students and parents receive an educational program which best fits their needs and interests.

This statement, however, is offset by other statements in larger type in the same communication:

> With the help of their parents and school counselors, students will be able to choose special CHOICE Programs at Wilmington or Dickinson high schools or conventional/traditional programs at A.I. duPont and McKean high schools.... It simply lets them pick a program which offers a good education with a focus on an area or subject in which they are interested.

RC–17.

44. The combination of the CHOICE plan's failure to commit to minimum enrollments and failure to set forth a mechanism in case a student is not assigned one of his four choices could lead to a troubling secnario in which one of the four high schools is substantially undersubscribed through the CHOICE procedure. For example, if only 100 ninth grade students select Wilmington High School as one of their four choices, the student assignment process outlined in the plan would leave the District far short of its target enrollment of 300 ninth graders at Wilmington High School. RC–30 at 34. While the District witnesses testified that such a contingency would be addressed by mandatorily assigning students to the undersubscribed high

school despite the students' failure to choose that school, Tr. 80 (Ames); Tr. 711–12, 1604–09 (Green), the plan nowhere provides for a mandatory assignment mechanism in the event of undersubscription. The District witnesses urged that this scenario was unlikely. In fact, the Acting Director of CHOICE for the Red Clay District testified that the possibility of mass selection away from a particular high school was not a contingency which the District had fully addressed. Tr. 80–82 (Ames).

45. Even if the District opted to assign students to an undersubscribed school, this practice in and of itself would create concern if the undersubscribed school were one of the two magnets. Such a procedure would result in assigning students into specialized curricula which would not dovetail with those students' predilections, interests and talents, and could result in increased non-achievement, dropouts and nonattendance. Tr. at 1733, 1749–50 (Bennett).

46. The plan also does not indicate the degree of flexibility in terms of a specialized assignment. As the plan now stands, eighth graders would make a decision which could conceivably lock them into a specialized curriculum for their entire secondary education. A related problem would be the ability of a student who was mandatorily assigned to a program in the ninth grade because he or she did not receive any of his or her four choices to access a different program the following year. According to the Superintendent of the Red Clay District, the student would be locked into his or her choice for at least one year, Tr. 1686 (Green), but that individual cases might be reviewed. Tr. 1686–87 (Green). Dr. Green stated that a student would be able to change programs between the ninth and tenth grades, but there would be less flexibility after the tenth grade. Tr. 1687 (Green). The court has been unable to find any statement in the December 14, 1990 application which addresses this. Dr. Green admitted that the degree of flexibility after a student has been assigned to

a program has not yet been explained to the parents.

47. The plan also fails to address assignment of students who enter the District during the school year and those who for one reason or another fail to fill out and submit a CHOICE form, Tr. 1594 (Green), although Dr. Green testified that a student who did not return a CHOICE form would be mandatorily assigned.

48. Plaintiffs also criticize the plan because they assert that it will not alleviate the "Substantive Problems." Plaintiffs assert that the time, funding, and energies of the Red Clay Board and administrative staff would be better spent directly addressing the Substantive Problems rather than pinning their hopes on the elixir of CHOICE to work its magic and make these problems disappear.

49. On pages 15–19 of the December 14, 1990 application, the District, in a section titled "Needs Assessment," details the disproportionate difficulties experienced by minority students in the Red Clay District in terms of attendance, enrollment in special education, suspensions, academic achievement, and dropout rates. RC–30 at 15–19.

50. A section entitled "A Clear Description of How the Objectives of the Project Relate to the Purposes of the Program" begins on page 39 of the December 14, 1990 application. RC–30 at 39. The court finds this section neither clear nor a description of a relationship between the project, the objectives stated in this section, and the Needs Assessment set forth on pages 15–19.

51. For example, the section sets forth "Academic Performance Objectives" envisioning that in each of the first two years of the plan, the performance disparity between minority and nonminority students at the magnet schools will decrease by 5 NCE points.[9] RC–30 at 41–42. While this objective does in fact dovetail with the statement in the Needs Assessment section

9. "NCE" stands for "Normal curve equivalent." Achievement scores expressed in NCE points are merely another way of expressing how students

are performing on standardized tests relative to students on a national sample basis. *See* Tr. 542–43.

that achievement score differences between the two groups of students differ in many cases by 20 NCE points or more, RC-30 at 19, nowhere is it explained how this objective will be achieved other than by the magical panacea of implementing the CHOICE proposal. Plaintiffs were unable to get any District witness to explain on the record the basis upon which the objective of 5 NCE points was derived. The president of the Red Clay Board referred plaintiffs to the superintendent. Tr. 544 (Allen). The superintendent could only answer that the data was derived from and assessed by outside consultants. Tr. 1537, 1541–42 (Green). When pressed, Dr. Green had to respond that he did not know how the objective of five NCE points was derived. Tr. 1542 (Green). As it turns out, the District actually originally proposed a reduction of 2 NCE points, RC-27 at 15–17, to which the State Board objected as not statistically significant. RC-28. Consequently, the objective was changed to 5 NCE points. Tr. 1560–62 (Green).

52. The remaining objectives listed in the section entitled "A Clear Description ..." discuss attendance, suspensions, dropouts, and promotions. RC-30 at 43–44. These objectives, however, do not dovetail with the Needs Assessment because they discuss increasing attendance, reducing suspensions, etc., in terms of the entire student population rather than in terms of the disproportionate difficulties of minority students in these areas. To the extent the District assumes that improvement in these areas over the entire student population will cause some improvement for minority students, the section still fails to describe how such improvements will occur beyond the magic worked by the mere implementation of CHOICE. Again, Dr. Green could not explain the basis for the specific objectives or how the objectives would be achieved. Tr. 1574–75 (Green).

53. The court finds that the District's CHOICE proposal, by itself, fails to address the Substantive Problems that concern plaintiffs other than to rely on the magnet and controlled choice components of the proposal as a sort of panacea for all ills. On the other hand, reassignment of students under Mixed Feeder II also would not address these issues. Consequently, it appears that if the Red Clay District is ever to eradicate root and branch the vestiges of prior discrimination and free itself from the court's supervision, the Board must work with plaintiffs to resolve the issues of minority attendance and suspension rates, dropouts, special education, low achievement, and the other substantive problems.

54. Finally, the State Board, as well as plaintiffs, have noted that the CHOICE proposal's parent outreach plan is insufficient. *E.g.*, Tr. 1147, 1165–66 (Fine). Paragraph 8 of the December 20, 1990 State Board Order, SB–23–6, appears to remedy these deficiencies.

55. The elementary magnet school proposal for Baltz Elementary School is merely a concept at this point. Most notably, the proposal lacks a detailed curriculum. RC-30 at 55–56. Even more importantly, the Red Clay Board has not come forward with any student assignment plans for determining where the students currently attending the Baltz Elementary School would be assigned. The plan also lacks a detailed description of the enrollment procedure, including the factors which would be used to determine which students would receive a preference in attending the Baltz magnet programs. Depending upon the details of the plan, implementation of an elementary magnet at Baltz could potentially affect a large number of students in terms of impact upon 9–3.

### D. The State Board Order of December 20, 1990

56. When the State Board approved the CHOICE proposal, it took the unprecedented step of issuing an order, SB–23–6, requiring the Red Clay District to accomplish certain tasks along a timeline. The State Board's order is an attempt (1) to ensure that student assignment patterns will be changed, either through CHOICE or by realignment of feeder patterns, to remedy the racial imbalances in the Red Clay schools in September 1991; (2) to remedy some of the deficiencies in the CHOICE

proposal; and (3) to assure that implementation of whatever student assignment changes occur in September 1991 proceeds smoothly.

57. During the June 1990 hearing, the President of the State Board assured the court that changes would occur in student assignments at Red Clay to remedy the racial imbalances in September 1991. *See Coalition to Save Our Children*, 744 F.Supp. at 593. The Red Clay Board's vote not to submit a backup plan to the State Board created a situation where the status quo would prevail in the event that the CHOICE proposal did not receive funding. Paragraph 5 of the State Board order ensures that, either by CHOICE or by realignment of feeder patterns, changes will occur in September 1991. Paragraph 5(b) instructs the Red Clay Board to submit a backup plan on or before March 1, 1991, and states that in the event the Red Clay Board does not submit a backup plan, the State Board will order that Mixed Feeder II be implemented as the backup plan. Paragraph 5(c) orders the District to have in place by April 15, 1991 plans sufficiently developed, as described in paragraph 6, to ensure implementation of both CHOICE and the backup plan as if proceeding to September 1 implementation. Paragraph 5(d) orders the backup plan adopted for September 1991 if the State Board finds that plans for CHOICE are not sufficiently developed, as set forth in paragraph 6, by April 15, 1991. Consequently, failure to perform the tasks set forth in paragraph 6 of the State Board order before April 15, 1991 would result in withdrawal of the State Board's approval of CHOICE. Tr. 1006 (Schiller); 1173 (Fine).

58. Paragraph 7 of the State Board order sets forth administrative tasks to be accomplished on or before July 31, 1991 in the event CHOICE is federally funded. According to Dr. Schiller, the State Board will withdraw support for CHOICE if the District does not comply with paragraph 7. Tr. 1006 (Schiller).

59. Paragraph 8 sets forth the parameters of an adequate parent outreach program which the District must effectively implement by April 1, 1991. State Board support for CHOICE will be withdrawn if the parameters of paragraph 8 are not satisfied. Tr. 1006 (Schiller); Tr. 1173 (Fine).

### E. The Red Clay Board's Record of Delay, Obfuscation, and Recalcitrance

60. In its July 1990 opinion, this court stated: "Indeed, so replete is this record with evidence of delay, obfuscation, and recalcitrance on the part of the Red Clay Board with respect to remedying the racial disparities in the Red Clay schools by reassigning students that there is no need to recite specifics." *Coalition to Save Our Children*, 744 F.Supp. at 592–93. The time has come to recite specifics.

61. Since at least March 19, 1984, the Red Clay Board has been aware of a need to take action to remedy racial disparities among its schools. On that date, then-Superintendent Joseph E. Johnson presented a memorandum to the Board members detailing the difficulties which they would confront as they moved to adjust feeder patterns. PX–35. What follows is the six-year history of the Red Clay Board's refusal to reassign students to remedy racial disparities in the Red Clay schools.

62. In June of 1986, the Red Clay Board came before the court seeking a temporary, one-time deviations from 9–3 so that it could adjust feeder patterns to relieve overcrowding in its schools. Red Clay's motion requesting the one-time deviations offered overcrowding as its only justification. Motion of Red Clay (Dkt. 1181). The 1986 feeder pattern realignments were not prompted by a desire to address the racial disparities at the Red Clay schools. Although the Coalition did not oppose the deviations, it drew the court's attention to the difficulty the plaintiffs were experiencing in obtaining a meeting with the Red Clay Board to discuss minority dropouts, suspensions, absenteeism, low achievement scores and the other Substantive Problems. The court urged the Red Clay Board to work with the Coalition to resolve those issues. PX–1–3; PX–1–4; PX–1–17 at 3.

63. On September 5, 1986, the Red Clay Superintendent proposed a meeting between the Coalition and the four school boards. However, the guidelines listed on the proposed agenda prohibited raising issues unique to any of the individual districts. PX-1-6. Consequently, such a meeting would not give the Coalition an opportunity to discuss its concerns involving conditions in the Red Clay District with the District's policymaking body.

64. Even after implementation of the 1986 feeder pattern realignments, there remained such significant racial disparities among the Red Clay schools that the Desegregation Advisory Committee, by resolution dated March 18, 1987, urged the State Board to address the racial disparities in the Red Clay District and their attendant impact on minority students in terms of the Substantive Problems. PX-1-13.

65. In a letter dated May 11, 1987, Dr. Keene, Superintendent for Public Instruction, acting on behalf of the State Board, requested Red Clay to respond to allegations concerning the racial disparities in their feeder patterns. SB-4. Dr. Johnson submitted a response on behalf of the majority of the Red Clay Board. PX-1-16.

66. On August 27, 1987, two of the Red Clay Board members dissented from the majority's response, pointing to the majority's obfuscation and failure to address racial disparities in the feeder patterns. PX-1-17.

67. On October 1, 1987, a substantial contingent of the State Board met with the Red Clay Board to voice its concern over the racial disparities in the District and offer its assistance in resolving the issue. SB-1; Tr. 467-68 (Allen). The Red Clay Board did not timely respond to the State Board's concerns. Tr. 468 (Allen). The suggestions eventually made by Red Clay in response to the State Board, including a proposal to house an exploratory vocational program at Wilmington High School, were rejected by the State Board because they would not significantly enhance desegregation so much as they would merely enable

maintenance of the status quo. SB-1; Tr. 468-69 (Allen).

68. What was to be the last meeting to date between the Coalition and the Red Clay Board convened specifically to address the Substantive Problems was held in November 1987. Tr. 1954 (Street). This meeting was apparently conducted pursuant to a mediation effort by federal officials. PX-1-23. It has been more than three years since the Red Clay Board has agreed to meet with the plaintiffs specifically to address the Substantive Problems.

69. On September 16, 1988, the State Board notified Red Clay that, after conducting a review of all four districts in the desegregated area, the State Board was insufficiently satisfied with the overall compliance of Red Clay to support a motion for declaration of unitary status on behalf of the Red Clay District. The State Board noted that it was sufficiently comfortable with the behavior of the other three districts to support motions on their behalf. SB-7.

70. On April 19, 1989, the State Board rejected a Red Clay proposal to house a magnet program at Wilmington High School because the program would not significantly advance desegregation. Tr. 471 (Allen).

71. On May 18, 1989, the State Board instructed Red Clay to bring its schools within $+/-$ 10% of the racial percentages of the District population as a whole by Fall 1991. The State Board requested that Red Clay's plan for accomplishing this objective be submitted to it on or before September 30, 1989. PX-1-47.

72. The Red Clay Board offered to meet with the Coalition in November 1989, two months after the State Board deadline for submitting a plan to remedy the racial disparities in the Red Clay District, to discuss feeder pattern changes. PX-1-56. The Substantive Problems were not part of the agenda. When representatives of the Coalition arrived for the meeting on Thanksgiving eve of 1989, a date and time selected by Red Clay, they found that three of the four Red Clay Board members, all three of whom were part of the Board majority that

consistently opposed feeder pattern changes, were not present. Tr. 1968 (Street).

73. After a series of requests for extensions, the District finally submitted Mixed Feeder I & II and a choice "concept" to the State Board on March 30, 1990—six months after the original deadline. PX–3. The State Board instructed the Red Clay Board to develop the choice concept into a complete plan for submission on or before September 1, 1990, almost one year after the date on which Red Clay was originally to have submitted a plan.

74. On July 20, 1990, Dr. Green requested that the Coalition name three persons to sit on the 35–member Central Coordinating Committee, which would make recommendations on overall planning and general operations of the CHOICE plan and three to sit on the 42–member Community-wide Advisory Committee, which would provide general advice on process and implementation and attempt to generate community support. RC–7. While several of the persons whose names were submitted by the Coalition were placed on each committee, others were not placed on the committees because they were not Red Clay residents. Tr. 67–68 (Ames).

75. On August 14, 1990, Dr. Green held a lunch meeting with members of the Coalition to request their support for the CHOICE plan. At that meeting, the Coalition members were presented with a series of possible enrollment configurations at the high school level. PX–86. They were not presented with a detailed plan of assignment. The Coalition members informed Dr. Green that they would discuss the proposal but that they doubted they could support a plan with so little information before them. Tr. 1944–46 (Street). Dr. Green reacted by calling a meeting with counsel present for that afternoon. Dr. Green conceded at the January 2–11 hearing that he would not expect the Coalition to be able to make a judgment on the plan

based upon the limited information which was presented to them at the August 14, 1990 meetings. Tr. 1519 (Green).[10]

76. The Red Clay Board submitted a plan on September 1, 1990. RC–18. This submission and the accompanying presentation by the Red Clay Board on September 6, 1990 did not constitute the complete plan envisioned by State Board President Paul Fine. (Tr. 1289). For example, the Red Clay Board did not submit a description of the magnet programs. Tr. 947, 959–60 (Schiller); Tr. 1107 (Fine). However, Mr. Fine felt that Dr. Green had accomplished a significant amount of work in a short period of time, Tr. 1293–94 (Fine), and he was aware that there remained sufficient time until the federal deadlines for funding applications in which the District could further develop the plan to a point where it would satisfy the State Board. Tr. 1290 (Fine).

77. The Red Clay Board developed the September 1, 1990 submission, which would become the blueprint for all submissions to follow, without any consultation with or input from plaintiffs beyond the August 14, 1990 meetings and the plaintiffs' representation on the two committees.

78. In a September 6, 1990 letter from Red Clay's counsel to the State Board, the District informed the State Board for the first time that it would be seeking what it termed "permanent" exemptions from 9–3. PX–48; SB–23–2; Tr. 1308 (Fine).

79. The Coalition first learned of the request for "permanent" exemptions when this same letter was copied to Coalition's counsel. Tr. 1950 (Street). The Red Clay District had developed a plan which would call for a major departure from the desegregation orders in this case without informing the Coalition ahead of time. When the Coalition requested a meeting with the Red Clay Board, they were granted a meeting only with Dr. Green because Red Clay's counsel believed a meeting with the Board

10. It should be noted that the Coalition also tends occasionally to be unreasonable. At this same meeting, the Coalition apparently demanded that all progress on the District's proposal be halted until the Coalition's approval could be obtained, even if that meant missing the deadline for federal funding.

would prove "too confrontational." Tr. 1951 (Street).

80. The State Board requested clarification of the plan as presented in early September, including further explanation in the areas of special education, equal opportunities for minority student participation in the magnet programs, and impact on unitary status. Dr. Green responded with an addendum on September 20, 1990. RC–19.

81. After receipt of the addendum, the State Board continued to have some concerns, which it voiced in a letter written by Dr. Keene of the Department of Public Instruction dated October 3, 1990. Among the concerns voiced were concerns about the adequacy of outreach to encourage minority parents and other parents who were not traditionally active in the schools to participate in choice and whether the plan would require waiver of any existing policies or rules of the State Board. RC–20. Thus, even after the State Board made clear that it had concerns over the effect of CHOICE on the minority children, Red Clay continued to fail to treat issues concerning minority students in a substantive manner. It was only due to the continual prodding by the State Board that the issues affecting minority students were addressed.

82. In response to the October 3 letter from Dr. Keene, Red Clay on October 26, 1990 informed the state authorities for the first time that it was considering an "alternative backup plan." SB–23–12. Prior to this time, the state authorities had assumed that Mixed Feeder II would be the backup plan. Tr. 950–51 (Schiller); 1109–10 (Fine).

83. The state authorities, through an October 30, 1990 letter by Dr. Keene, requested further information concerning the backup plan. SB–23–13. The Red Clay Board did not formally respond to this request until it informed the State Board on November 29, 1990 that it would not submit a backup plan.

84. On October 14, 15, and 17, 1990 the Red Clay Board attempted to conduct and did conduct meetings in executive session. The Attorney General of the State of Delaware found these meetings were conducted in violation of Delaware's Sunshine Act. PX–40. The subjects addressed at these sessions deliberately conducted away from public scrutiny involved the CHOICE proposal. PX–61.

85. On November 14, 1990, Red Clay sent the State Board a more complete response to the questions raised by the October 3 letter in the form of a second addendum. RC–24.

86. On November 16, 1990, State Board President Paul Fine wrote a letter to Red Clay Board President David Allen urging prompt submission of Red Clay's funding application to the State Board in order to give the State Board adequate time for a full review prior to the federal deadline. In the same letter, Mr. Fine noted that the State Board's review of the agenda of the November 13, 1990 Red Clay Board meeting indicated consideration of a magnet school at the elementary level—a proposal never previously presented in any form to the State Board. Mr. Fine voiced his concern that the State Board would not have adequate time to review this wholly new proposal. Mr. Fine also urged the adoption of a backup plan in the event federal funds were not forthcoming and encouraged the adoption of Mixed Feeder II as the backup. SB–23–14.

87. On November 21, 1990, Red Clay received a letter from its then-counsel advising that:

[I]f the Board fails to adopt a viable back-up plan and if it is the Board's decision to direct us to oppose the implementation of Mixed Feeder Plan II, it is our view that we could no longer effectively represent the Board. Under such circumstances, we would be forced to withdraw as counsel.

Stipulation of the Parties (Jan. 17, 1991) (Dkt. 1333).

88. At a very contentious Red Clay Board meeting on November 28, 1990, the Board voted 4–2 not to submit a backup plan, despite the fact that their own Superintendent recommended that a backup plan be submitted in light of the State Board's

request. RC–25; Tr. 499 (Allen); Tr. 734–35 (Green). At the same meeting, the Board voted 4–2 to replace its counsel. RC–25.

89. The following day, Red Clay submitted its application for federal funding to the State Board, RC–27, along with a response to Mr. Fine's November 16 letter. RC–26. The tone of the Red Clay Board's response to Mr. Fine charitably may be described as defiant.

90. Mr. Fine was both "surprised" and "disappointed" at the tone of Red Clay's response. Tr. 1146 & 1150 (Fine).

91. In response to the State Board's inquiry into the proposed magnet at an elementary school, a proposal heretofore unknown to the State Board, the Red Clay Board responded:

> Your letter questions whether the State Board will permit the Choice school proposal for Baltz Elementary to go forward with our grant application. We are aware of your reluctance and skepticism regarding Choice educational programs. The discussions of this summer and fall have made that clear. However, our Board has selected Educational Choice as its direction and intends to move forward with it.... [I]t is time for the State Board to let us manage our own district. We fear that your suggestion that you "may not have sufficient time to review the contents and implications of the elementary component of the Choice proposal in order to take action by December 12, 1990" is, in actuality, the latest expression of your own skepticism concerning Choice. We continue to be disappointed at the resistance toward a concept that will serve educational objectives that we find important....

92. Mr. Fine was surprised that Red Clay would take the position that the State Board's constructive suggestions and questions were evidence of skepticism and opposition, especially[^1] considering the State Board's patience, responsiveness, and technical support since February 1990. Tr. 1150–51 (Fine).

93. Mr. Fine was also disappointed with Red Clay's failure to submit a backup plan, especially in light of the State Board's repeated requests that it do so. He considered this evidence of the Red Clay Board's disharmony and their unwillingness to "make the hard decision." Tr. 1151–52 (Fine).

94. Moreover, the failure to submit a backup plan meant that implementation of a remedy for racial imbalances in the Red Clay Schools in September 1991 was hostage to the chance of receiving federal funds. If the District failed to obtain such funds, CHOICE could not be implemented and the status quo would prevail despite the District's assurances to this court in June 1990 that action would be taken to address the racial disparities in the Red Clay schools in September 1991.

95. The reason given by the Red Clay Board witnesses for failure to adopt a backup plan is that implementation of the CHOICE plan as written would guarantee racial balances in the schools through mandatory assignments even if students did not choose the schools in the correct racial proportions. Tr. 458–59 (Allen); Tr. 1901–1903 (Manning). However, Mr. Fine in his November 16 letter made it quite clear that a backup was necessary *in case CHOICE was never implemented* due to lack of funding. SB–23–14 ("We understand that you have begun a deliberation of alternatives *to fall back upon should the federal magnet grant not receive funding....*") (emphasis added). Consequently, the Red Clay Board was aware of the need to submit a backup plan to ensure that the racial disparities in the schools would be addressed in September 1991. That they did not do so is another example of the lack of commitment on the part of the majority of the Red Clay Board to accomplishing eradication of the vestiges of *de jure* segregation.

96. Despite assurances given to this court during the June 1990 hearing that action would be taken to address the racial disparities in the Red Clay schools by September 1991, three of the six current members of the Red Clay Board would vote to maintain the status quo rather than change feeder patterns in the event the District

fails to obtain funding for its CHOICE plan. Tr. 521 (Allen).

97. The Red Clay Board presented what it thought would be its final magnet schools application, RC–27, to the State Board at its December 6, 1990 meeting. The State Board continued to have questions and concerns at that meeting. Last minute changes in the federal deadlines enabled the State Board to present the Red Clay Board with a list of its concerns and a request that the Board revise its application yet again. RC–28.

98. The revision conducted in accordance with the State Board's instructions resulted in the final application, the December 14, 1990 application. RC–30.

99. Although the Red Clay Board was aware in advance that the State Board would issue an order concerning the CHOICE proposal on December 20, 1990 and that it would be in court seeking modifications of 9–3 on January 2, 1991, the Board did not think it important to convene a meeting prior to January 2 to establish ahead of time its position regarding the State Board order. Tr. 515–17 (Allen). This resulted in obfuscation of the Red Clay Board's position on the State Board order. Tr. 510–517 (Allen).

100. Despite the Board's numerous statements that CHOICE is intended as a desegregation plan and their stated goal of parental involvement, the Board did not undertake to place a parent information center on CHOICE in the area where most of the African–American families in the district live until ordered to do so by the court. Tr. 130–33 (Ames); Tr. 452–53.

*F. The State Board Has Adequately Attempted to Enforce This Court's Orders While at the Same Time Allowing the School District to Manage Its Own Affairs*

101. The State Board has an obligation to enforce the desegregation orders of this court, including the 9–3 plan, and is empowered to direct, compel, order and require any of the four districts in the desegregated area to establish and maintain a pupil assignment plan which comports with the court's orders. 14 Del.C. § 122(c). The 9–3 plan was incorporated into the "Regulations for the Reorganization of the New Castle County District—1980." SB–22.

102. The State Board considers issuance of an order an action of last resort, and in fact, prior to its December 20, 1990 order regarding CHOICE, the State Board had never found it necessary to issue an order to a local school district. Tr. 1153 (Fine).

103. For the past several years, the State Board has been attempting to convince the Red Clay District to remedy the racial disparities in its schools without being forced to the last resort of issuing an order.

104. On May 11, 1987, the State Board responded to the Desegregation Advisory Committee's resolution calling for state authorities to look into the racial disparities in the Red Clay District. The State Board requested the Red Clay Board to respond to the allegations in the resolution. SB–4.

105. On October 1, 1987, a contingent of the State Board met with the Red Clay Board to voice their concern over the racial disparities in the District. At that meeting, the State Board offered to assist Red Clay in its efforts to enhance the desegregation process generally and specifically with respect to the racial imbalance between A.I. duPont and Wilmington high schools. SB–1; Tr. 467 (Allen).

106. The suggestions made by Red Clay in response to this offer, including a proposal to house an exploratory vocational program at Wilmington High School, were rejected by the State Board because they would not significantly enhance desegregation so much as they would merely enable maintenance of the status quo. SB–1; Tr. 468–69 (Allen).

107. In August 1988, the State Board passed a motion to begin movement toward unitary status in the Brandywine, Colonial, and Christina districts and to set in motion procedures to assure compliance with the spirit of the desegregation orders in the Red Clay District. SB–5.

108. On September 16, 1988, the State Board notified Red Clay that, after conducting a review of all four districts in the desegregated area, the State Board was insufficiently satisfied with the overall compliance of Red Clay to support a motion for declaration of unitary status on behalf of the Red Clay District. SB–7.

109. Some time after April 1988, the President of the State Board, the Superintendent for Public Instruction, the Attorney General and a Deputy Attorney General met with the President and Superintendent of the Red Clay District and their counsel to discuss the status of desegregation in Red Clay. Tr. 469–70 (Allen).

110. The State Board's concerns about Red Clay are evidenced by its request that information specifically regarding Red Clay be gleaned from a report prepared on the desegregated area and summarized for its consideration. PX–1–24.

111. On February 6, 1989, the State Board requested all four districts in the desegregated area to respond to a questionnaire concerning their progress toward desegregation. In addition to covering the issues of racial composition of schools and classrooms, many of the questions addressed the Substantive Problems, including minority enrollment in special education, minority suspension, expulsion, arrest, and dropout rates, etc., which have concerned the plaintiffs. PX–1–34.

112. On April 19, 1989, the State Board rejected a Red Clay proposal to house a magnet program at Wilmington High School because the program would not significantly advance desegregation. Tr. 471 (Allen).

113. In response to the Coalition's requests for a meeting, the State Board indicated a willingness to meet with the Coalition after the responses to the February 6, 1989 questionnaire were received. PX–1–36. The State Board apparently did meet with the President of the Coalition, Jea P. Street, on May 18, 1989. PX–1–45; PX–1–46.

114. On May 18, 1989, the State Board requested the District to bring its schools within +/− 10% of the racial percentages of the District population as a whole by Fall 1991, and requested that the District submit a student assignment plan on or before September 30, 1989. The Red Clay Board adopted +/− 10% as its own objective. PX–1–47.

115. When the plaintiffs objected that the timetable setting achievement of +/− 10% for September 1991 was too long, PX–1–48, the State Board responded to the plaintiffs in a timely manner; however, the State Board stood by its judgment that phased in changes spanning the 1990–91 and 1991–92 school years were preferable. PX–1–49.

116. Despite Red Clay's numerous delays in presenting a student assignment plan, the State Board attempted to hold the District's feet to the fire without resorting to the unprecedented measure of issuing an order. SB–14 (State Board letter to Red Clay dated November 16, 1989 stating that the State Board "expects the Red Clay Board to take responsibility for achieving a pupil assignment plan in which all schools in the District are within the +/− 10% range.... [W]hile the State Board has not issued a formal order to meet the standard ... it does have the power to do so"); *see also* SB–16; SB–17.

117. After the Red Clay Board presented its CHOICE proposal in September 1990, the State Board continued to try to fulfill its duty to enforce the desegregation orders of the court while at the same time allowing the District to make decisions concerning education and student assignment for itself.

118. The State Board and its staff scrutinized each District submission for its potential both in terms of education and desegregation and offered comments and questions where it deemed the submission lacking. *E.g.*, RC–20; SB–23–13; SB–23–14; RC–28. Many of the State Board's questions and concerns reflect consideration of the comments offered by the Desegregation Advisory Committee. *See* Plaintiffs' Motion, Exh. O (Dkt. 1294).

119. The State Board's December 20, 1990 order, SB–23–6, is the most recent

example of its attempts to allow the District to move forward with a program it has chosen for itself while still fulfilling its duty to ensure desegregation. The State Board order ensures that the racial imbalances in the Red Clay schools will be remedied either by CHOICE or by feeder pattern realignment in Fall 1991. It also attempts to ensure that the District will implement adequately whichever student assignment plan it eventually uses in September. Finally, the State Board attempted to ensure that the District will reach out to all parents in the community to better assure that children whose parents are not active in the schools will not be disadvantaged by CHOICE.

120. Plaintiffs question the State Board's good faith in approving the CHOICE plan given the Red Clay Board's dismal historical record with regard to student assignments. The State Board President summarized the concerns and reasoning of the State Board better than any paraphrasing by this court could:

Q. What is it about this CHOICE proposal that convinced you and the State Board that it was worth changing away from the 9–3 provision in the court order?

A. One could argue or—strike that. One could take the position that the existing educational programs available in the public schools in New Castle County are not serving the intended purpose of that class of students that were incorporated into the court order and that we as a State Board have a responsibility in my judgment to look at the educational opportunities that might be afforded all students in New Castle County and, in fact, throughout the state to provide them with a greater opportunity for future success. And we should not be so narrow in our thinking as to not provide an opportunity for innovation and creativity in any school district in this state that would in fact have the possibility of providing a higher, greater expectation from the perspective of the relationship between the teacher and the student, the teacher and his or her student.

And I would suggest that in my short time in being exposed to what is in fact happening as an example in Red Clay that the present system may need to be reevaluated as we move forward so that an educational initiative such as CHOICE could provide that opportunity for future success.

Q. Do you believe that the CHOICE plan as described by the documents that are submitted here does that?

A. I honestly don't know. If you, if you believe in what the district says or that the document as presented to us is fluff, as the president of the district inferred, and if you believe that the components of that plan are ones that can be implemented, then I would, I would suggest that we would be obligated in some constructive way to support what in fact they want to do from an educational perspective.

I can only go on the basis of what has been presented and what I read in the documents and I think that basically goes to the heart of the matter, and that is whether one believes that the district is committed to the spoken word in that document or whether the district has the credibility to deliver what in fact it has said in those documents. . . .

My role is to try to be as objective as I can as I see it as the president of the State Board and to support an initiative of a district that has the potential to be constructive, has the potential to be innovative, has the potential to give young people in that district an opportunity for future success, but at the same time to be sure that what in fact they express they plan to do and will in fact be implemented.

Q. Was that the intent of the State Board's order?

A. Yes, it was.

Tr. 1182–1185 (Fine).

121. The court finds that the evidence shows the State Board has in good faith carried out its obligation to enforce the desegregation orders of this court.

## CONCLUSIONS OF LAW

Although the court does not have before it a motion for declaration of unitary status, Red Clay argued in both its pre-trial and its post-trial briefing that the court should grant deference to the decisions of the Board because the District has achieved unitary status or is very close. Consequently, prior to addressing the two motions before it, the court will address the issue of whether Red Clay has achieved anywhere close to unitary status. The United States Supreme Court made its most recent comments regarding when a school district may be considered "unitary" in *Board of Educ. of Oklahoma City Public Schools, Indep. School Dist. No. 89 v. Dowell,* —— U.S. ——, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991). As the Court noted, usage of the term "unitary" by the lower courts has been inconsistent and confusing. *Id.* at ——, 111 S.Ct. at 634–36. The court will therefore dispense with that terminology.

■ Judging from Red Clay's arguments, it appears that by "unitary status" Red Clay means that it should be released from the burden of the desegregation orders and from ongoing court supervision. While federal court supervision of local school systems in desegregation cases was always intended as a temporary measure, the court's desegregation decrees and its supervision operate until the court finds that the school board has complied with the desegregation orders in good faith, is unlikely to return to the segregative practices employed by its predecessor, and that "the vestiges of past discrimination had been eliminated to the extent practicable." *Id.* at ——–——, 111 S.Ct. at 638. In other words, the court must make a finding that the district is currently and will continue to be operated in compliance with the commands of the Equal Protection Clause of the fourteenth amendment. *Id.* at ——, 111 S.Ct. at 636–38.

As detailed *supra*, minority students in the Red Clay District have yet to achieve a full measure of equality. While technically maintaining a 9–3 feeder pattern, the Red Clay Board has knowingly allowed schools which are clearly perceived as "minority" and "nonminority" schools to exist within the District for at least six years. Moreover, the Board has failed for many years to address the secondary effects of the racial imbalances in its feeder patterns, including a large number of racially disproportionate classrooms, low minority achievement scores and college matriculation, etc. In its own magnet grant application, Red Clay points out that its racial disparities need remedying. RC–30 at 14–25.

Red Clay argues that some school districts have been released from further court supervision even though they still contained one or more single-race schools. However, each school district is unique, and the conditions in each district largely determine how and if prior discrimination has been eradicated. *Flax v. Potts,* 915 F.2d 155, 161 (5th Cir.1990). In those cases where districts are permitted to continue operating one-race schools, the court almost always makes a finding that there is no practicable way to further integrate the district to eliminate one-race schools. *E.g., Davis v. East Baton Rouge Parish School Bd.,* 721 F.2d 1425, 1435 (5th Cir.1983) ("But until it can show that all reasonable steps have been taken to eliminate remaining one-race schools, the Board must in its pursuit of a unitary system respond as much as reasonably possible to patterns and changes in the demography of the parish."). Red Clay does not argue that there is no practicable way to eliminate the racial disparities among its schools.

While the Red Clay Board has been in technical compliance with this court's orders, the court has very grave doubts concerning the Board's *good faith* compliance with the spirit of desegregation. The court has already found that its prior orders have not succeeded in moving Red Clay toward eradication of the vestiges of prior segregation. By comparison, the court notes, and the plaintiffs acknowledge, that the other three school districts in the desegregated area have complied with the spirit of the court's order in such a way as to be making progress toward operating in com-

pliance with the Equal Protection Clause. *See* Plaintiffs' Opening Post–Trial Brief at 20 (Dkt. 1334) ("The other three districts subject to the Desegregation Orders and the Coalition have cooperated with each other in addressing the racial identification of schools and classrooms as well as with reference to the Substantive Problems") (citation to the record omitted).

With all of this in mind, the court cannot and will not make a finding that the Red Clay District is currently operating in compliance with the Equal Protection Clause, nor can the court find that the currently constituted majority of the Red Clay Board, in the absence of supervision by the State Board, will operate the District in compliance with the United States Constitution in the near future.

The court now turns to the two motions pending before it. Both plaintiffs and defendant Red Clay seek a change in the status quo involving a rearrangement of student assignments so as to reduce the racial disparities among the Red Clay high schools. The approach of the parties, however, is very different. Plaintiffs request the court to go beyond its prior orders imposing a 9–3 feeder pattern and order the Red Clay District to devise specific student assignment patterns that both comply with 9–3 and reduce racial disparities. Red Clay, on the other hand, seeks partial relief from 9–3 to enable it to implement a method of student assignment the District claims will reduce disparities where students choose which of the four high schools they will attend.

In resolving the litigants' differences it is important to delineate the function of the court. The court's jurisdiction and authority to act in this case are derived from the violations of the rights of the plaintiff class under the Equal Protection Clause of the United States Constitution as found by the three-judge panel in 1974. *Evans v. Buchanan*, 379 F.Supp. 1218, 1223 (D.Del. 1974). Thus, the court's duty is limited to assuring that the separate and inherently unequal schools condemned by the Supreme Court in *Brown I* and their lingering effects are eliminated to the extent practi-cable. Matters of educational equality are the province of local educators and not of this court. *See Evans 1978*, 447 F.Supp. at 1000. The fourteenth amendment requires an equal education. There is no constitutional guarantee of a quality education. The constitution is satisfied if all of the students in Red Clay receive an equally bad education, regardless of race.

What this means for the issues at hand is that the court cannot and will not pass upon the educational quality of the CHOICE plan vis-a-vis student feeder pattern realignment. In light of concerns raised at trial, however, especially regarding those students who may be mandatorily assigned into the magnet programs, the court urges the State Board to monitor closely the quality of education received by Red Clay students under CHOICE.

■ With the court's function in mind, the court now turns to the issues at hand. If further desegregation of a school district is reasonable, feasible, and workable, it should be undertaken. *Davis v. East Baton Rouge Parish School Bd.*, 721 F.2d 1425, 1434 (5th Cir.1983). If the court finds that its remedial decrees no longer suffice as adequate means for achieving eradication of the vestiges of prior segregation, it can and should modify the decree to bring about the relief to which plaintiffs are entitled. *Coalition to Save Our Children*, 744 F.Supp. at 585–87.

In July 1990 and again in this Opinion, the court found that the District's technical compliance with the 1978 and 1981 desegregation orders has failed to move the District toward eradication of the vestiges of prior segregation to the greatest extent possible. Not only have the student assignments remained racially imbalanced among the District's feeder patterns, but the negative effects of racial imbalance upon the minority students remains unchecked. *See Board of Educ. of Oklahoma City Public Schools, Indep. School Dist. No. 89 v. Dowell,* —— U.S. ——, ——, 111 S.Ct. 630, 638–40, 112 L.Ed.2d 715 (1991) (in considering whether the vestiges of *de jure* segregation have been eliminated, the district court should look at every

facet of school operations, including student assignment, staff, transportation, extra-curricular activities, and facilities); *Reed v. Rhodes*, 455 F.Supp. 569, 597 (N.D. Ohio 1978) ("The obligation of defendants ... goes beyond reassignment of pupils to fully integrated schools and classrooms. Defendants have the further constitutional obligation to develop educational programs that will correct the effects of prior segregated schooling to the greatest extent possible."). In considering the need for further desegregation, the court must keep in mind the cornerstone of constitutional analysis of segregated schooling that "separate educational facilities are inherently unequal." *Brown v. Board of Education*, 347 U.S. 483, 495 (1954) (*Brown I*).

When desegregation relief is warranted, it is incumbent upon the educational authorities to come forward with a plan which "promises meaningful and immediate progress toward disestablishing [prior] state-imposed segregation." *Green v. County School of New Kent County*, 391 U.S. 430, 439, 88 S.Ct. 1689, 1695, 20 L.Ed.2d 716 (1968). The court must weigh the plan submitted by the school authorities "in light of the facts at hand and in light of any alternatives which may be shown as feasible and more promising in their effectiveness." *Id.; see also Hoots v. Commonwealth of Pennsylvania*, 539 F.Supp. 335, 339 (1982), *aff'd*, 703 F.2d 722 (3d Cir.1983) ("The burden is on the School Board to show that the plans they have submitted are the most effective means of accomplishing complete desegregation.").

The court has already found that neither the CHOICE plan submitted by Red Clay nor the feeder pattern realignment favored by plaintiffs is likely to remedy the Substantive Problems which are the secondary effects of racial imbalances both past and present. The District must address the Substantive Problems in a meaningful way if it wishes to eradicate the vestiges of prior segregation and relieve itself of court supervision. The competing forms of relief proposed by plaintiffs and the Red Clay district must be judged in terms of their effectiveness in remedying the racial disparities in student assignment.

■ The court should step in and order relief, however, only when the school authorities fail in their affirmative obligation to offer a plan which will lead to the provision of a desegregated education. *Evans 1981*, 512 F.Supp. at 850; *see Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971) ("In default by the school authorities of their obligation to proffer acceptable remedies, a district court has broad power to fashion a remedy"); *Hoots v. Commonwealth of Pennsylvania*, 539 F.Supp. 335, 338 (1982), *aff'd*, 703 F.2d 722 (3d Cir.1983). The gist of plaintiffs' argument is that the CHOICE plan brought before the court by the Red Clay Board is so deficient that the Red Clay Board and the State Board have abdicated their responsibilities and the court should step in and order the relief requested by plaintiffs. Plaintiffs' argument is premised upon their assumption that the realignment of Red Clay feeder patterns is more promising and more effective in terms of its ability to remedy racial imbalances in student assignments than the Red Clay CHOICE plan. This assumption is faulty. While the CHOICE plan as written does contain certain deficiencies with regard to the Red Clay Board's commitment to use the plan to remedy the racial imbalances in student assignment, these deficiencies can and will be corrected by court order. The CHOICE plan as modified by the order of the State Board and further modified by this court does promise to bring the four Red Clay high schools to within +/− 10% of the racial composition of the District at grades 9–12 and will not be subject to the vagaries of demographics.

■ The courts have acknowledged that voluntary techniques have a place in desegregation plans where they offer a promise of aiding a school district to move toward full compliance with the fourteenth amendment. *Green v. School Bd. of New Kent County*, 391 U.S. 430, 440–41, 88 S.Ct. 1689, 1695–96, 20 L.Ed.2d 716 (1968); *see also Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 488, 99 S.Ct. 2941, 2992, 61

L.Ed.2d 666 (1979). The Red Clay CHOICE plan combines two voluntary desegregation techniques—magnet schools and student assignment through choice.

The case law reveals that the "utility and propriety of magnets as a desegregation remedy is beyond dispute." *Liddell v. State of Missouri*, 731 F.2d 1294, 1310 (8th Cir.), *cert. denied sub nom, Leggett v. Liddell*, 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984); *see also United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1239 (2d Cir.1987), *cert. denied*, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988) (though more costly, magnets are "both less intrusive and more likely to achieve long-term success in desegregating the public schools"); *Flax v. Potts*, 725 F.Supp. 322, 325 (N.D.Tex.1989), *aff'd*, 915 F.2d 155 (5th Cir.1990) ("Magnet schools are a very successful means of meeting the school district's goals of quality education and integrated schools."). For instance, the use of magnet schools to prevent or reduce white flight has been considered both appropriate and beneficial so long as the magnets promise to be effective in reducing racial disparities. *Stell v. Savannah–Chatham County Bd. of Educ.*, 888 F.2d 82, 85 (11th Cir.1989) ("Plans ... that are designed to attract white students into predominantly black schools are suitable as long as they do not frustrate desegregation efforts"); *Davis v. East Baton Rouge Parish School Bd.*, 721 F.2d 1425, 1438 (5th Cir.1983) ("[U]se of special programs designed to make the desegregated schools more attractive to students and parents and thereby minimize white flight is entirely appropriate as long as the cause of desegregation is not frustrated") (citation omitted).

Those courts which have rejected desegregation plans involving the use of magnet schools have done so for one or more of the following reasons: (1) the plan lacked attendance and enrollment guidelines to ensure its effectiveness, *United States v. Pittman by Pittman*, 808 F.2d 385, 388–89 (5th Cir.1987) (adherence to racial balance targets without commitment to minimum enrollment could lead to very low magnet school enrollment if only a few nonminority students apply), (2) the plan allowed one-race schools to continue where other plans involving mandatory techniques would leave fewer or no one-race schools, *United States v. Pittman by Pittman*, 808 F.2d 385, 389 (5th Cir.1987); *Davis v. East Baton Rouge Parish School Bd.*, 721 F.2d 1425, 1432–33 (5th Cir.1983), or (3) the plan was at most a concept which showed no sign of careful planning or serious intent, *Hoots v. Commonwealth of Pennsylvania*, 539 F.Supp. 335, 342–43 (1982), *aff'd*, 703 F.2d 722 (3d Cir.1983); *Reed v. Rhodes*, 455 F.Supp. 569, 600 (N.D.Ohio 1978). Most courts that have rejected magnet plans have acknowledged their potential. *E.g., Davis v. East Baton Rouge Parish School Bd.*, 721 F.2d 1425, 1437 (5th Cir.1983) ("The theory was and is entirely commendable...."); *Reed v. Rhodes*, 455 F.Supp. 569, 600 (N.D.Ohio 1978) (ordering defendants to develop a comprehensive plan for magnet schools and outlining the parameters of an acceptable magnet program).

While a desegregation plan which relies 100% upon voluntary techniques is not necessarily unconstitutional, *see Stell v. Bd. of Public Educ. of City of Savannah*, 724 F.Supp. 1384, 1401 (S.D.Ga.1988), *aff'd*, 888 F.2d 82 (11th Cir.1989) (citing *Davis v. Board of Comm'rs*, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971) and *Calhoun v. Cook*, 522 F.2d 717, *on reh'g*, 525 F.2d 1203 (5th Cir.1975)) ("[T]he law does not require that a desegregation plan be mandatory in any way, only that it be effective"), the courts have indicated a marked preference for a mandatory component, such as attendance and enrollment guidelines or caps on enrollment by students of a particular race. *Diaz v. San Jose Unified School District*, 861 F.2d 591, 593 (9th Cir.1988); *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1239 (2d Cir.1987), *cert. denied*, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988) (affirming mandatory techniques imposed by the district court at *United States v. Yonkers Bd. of Educ.*, 635 F.Supp. 1538 (S.D.N.Y. 1986)); *United States v. Pittman by Pittman*, 808 F.2d 385, 389 (5th Cir.1987); *Liddell v. State of Missouri*, 731 F.2d 1294, 1310 (8th Cir.1984); *Davis v. East Baton*

*Rouge Parish School Bd.,* 721 F.2d 1425, 1440 (5th Cir.1983); *Stell v. Board of Public Educ. for the City of Savannah and the County of Chatham,* 724 F.Supp. 1384, 1403 (S.D.Ga.1988), *aff'd,* 888 F.2d 82 (11th Cir.1989). The plan proposed by Red Clay superimposes such mandatory techniques through its student assignment or "controlled choice" component. Where the District's commitment to such mandatory techniques is questionable or deficient, the court will mandate their use in its order.

Magnet plans which do not base participation upon prior achievement are preferred because they reduce disparities without favoring the best of the minority students over average students. *United States v. Pittman by Pittman,* 808 F.2d 385, 390 (5th Cir.1987) (Higginbotham, J. concurring). Dr. Schiller informed the court that the Red Clay plan included this aspect by eliminating "tracking," the practice of programming students into courses based upon ability and past performance, and by opening the magnet programs to all students regardless of past achievement.

The courts have also preferred magnet plans which use schools and facilities which best further desegregation goals and reduce declining enrollment. *Reed v. Rhodes,* 455 F.Supp. 569, 600 (N.D.Ohio 1978). The choice of Wilmington High School as one of the magnet sites appears calculated to address that high school's current racial disparities and declining enrollment.

Finally, courts appear more inclined to approve magnet programs which supplement rather than replace existing desegregation plans. *United States v. Pittman by Pittman,* 808 F.2d 385, 390 (5th Cir.1987). As currently written, the CHOICE plan at the high school level would supplement rather than replace the current desegregation orders. As noted in the Findings of Fact, fully three-quarters of the Red Clay students will have attended a City school for three years pursuant to the court's orders during grades 1–8. Implementation of the CHOICE plan at the high school level would not affect compliance with 9–3 as it concerns these students.

At least one appellate court has found the use of voluntary techniques, such as magnet schools, appropriate when mandatory techniques have failed. *Stell v. Savannah–Chatham County Bd. of Educ.,* 888 F.2d 82, 85 (11th Cir.1989). However, the district court in the *Stell* case made a finding that the school district had carried out the mandatory desegregation plan in good faith, a finding this court expressly declines to make based upon this record. *Stell v. Board of Public Educ. for the City of Savannah and the County of Chatham,* 724 F.Supp. 1384, 1400 (S.D.Ga.1988), *aff'd,* 888 F.2d 82 (11th Cir.1989) ("The failure of [the mandatory pairing and busing plan] was not due to any reluctance or failure of the School Board to implement the plan.").

To this point, the court has not addressed Red Clay's proposed implementation of a magnet site at the Baltz Elementary School. Because this proposal is no more than a concept at this point in time, it does not promise the same effectiveness as implementation of the CHOICE proposal at the high school level. The court is not in the business of modifying desegregation orders to make way for concepts. *See Hoots v. Commonwealth of Pennsylvania,* 539 F.Supp. 335, 342–43 (W.D.Pa.1982), *aff'd,* 703 F.2d 722 (3d Cir.1983) ("The Board's proposal is still in an embryonic state. They have no projections on how many students would be expected to attend this voluntary program, or how racially mixed the school might be. The plan is too vague and the effects on desegregation too speculative to be acceptable to this court."). At the same time, the court is aware that the proposals for Baltz are included in the federal Magnet Schools Assistance Program application and that failure to grant the modifications necessary for Baltz could sabotage the entire application. The court will grant the modification for Baltz conditionally. First, the modification is granted *only* if the District receives funding from the Magnet Schools Assistance Program and then only after the District devises a comprehensive and detailed plan and the State Board certifies to this court that it is

satisfied with the Baltz program's impact upon desegregation.

No one argues that the implementation of the CHOICE plan would not remedy the racial imbalances among the four high schools so long as the Red Clay District maintains the commitments made by witnesses at trial to a minimum enrollment and to achieve the desegregation targets of $+/-$ 10% set by the District in the Magnet Schools Assistance Program application. What plaintiffs question is whether the District will implement the plan in accordance with those oral commitments. As previously stated, the court will incorporate those commitments into its order as conditions upon which the modification of 9–3 will continue from year to year.

Plaintiffs also fear that implementation of CHOICE will place an undue burden on minority children by taking away the "fairness" provided by 9–3. Plaintiffs are correct in their assertion that the court selected the 9–3 plan over other plans proposed in 1978 because 9–3 placed the least burden on the class of students whose rights had been violated: "At the very least, fundamental fairness demands that decisions that have the effect of maximizing the burden on black students be supported by justifications of a non-racial nature." *Evans 1978*, 447 F.Supp. at 1004. It continues to be the obligation of the court to ensure the burdens of desegregation are distributed equally and without discrimination. *Diaz v. San Jose Unified School District*, 861 F.2d 591, 596 (9th Cir.1988). Whether a particular group is burdened impermissibly depends upon "the validity of the [school] [b]oard's justifications for its proposals and the availability of feasible alternatives." *Id.* (citation omitted).

As best the court can ascertain, plaintiffs' fears of undue burden center upon the possibility that minority City students who would have been assigned to a neighborhood school will wind up being bussed all twelve years if they choose or receive an assignment other than Wilmington High School. At the same time, plaintiffs point out that the CHOICE plan will enable some suburban students to avoid ever being bussed to a City school.

Implementation by Red Clay of the Mixed Feeder I K–8 feeder realignment somewhat alleviates the concerns of plaintiffs by shifting the three-year City school assignment of two grids of students from grades 9–12 to grades 1–3. In addition, the analysis performed by Dr. Spartz indicated that only two groups of students would not spend three years in the City schools prior to grade 9. Those students are located within walking distance of Wilmington High School. Consequently, if they choose Wilmington High School they will receive a preference in the CHOICE assignment process over other students of the same race.

Plaintiffs see implementation of CHOICE, especially at the Baltz Elementary School, as leaving room for "mischief" for an untrustworthy majority on the Red Clay Board. The court does not disagree. As a consequence, the court has crafted an order which it hopes will remove most of the latitude for bad faith on the part of the majority of the Red Clay Board. The order has been attached as Appendix A to this Opinion. The following section explains the various provisions of the order so as to leave no doubt or room for argument in how the provisions of the court's order are to be carried out.

THE ORDER

▪ Plaintiffs' motion requested that the court order the Red Clay District to realign its feeder patterns as the only viable remedy to racial disparities among the schools in the District. The motion also sought a court order instructing the State Board and the Red Clay board to set an agenda for addressing what plaintiffs have termed the "Substantive Problems." Various portions of the court order directly address some of the concerns raised by plaintiffs' motion. For example, paragraph 2.a. allows one-time deviations from the court's prior desegregation orders to enable Red Clay to realign its pupil assignment patterns in grades K–8. Paragraphs 2.b.(xvi) and 2.b.(xvii) directly address the Substantive Problems. Consequently, paragraph 1 of the Order denies plaintiffs' motion only to

the extent that it does not address the Coalition's concerns in the manner which the Coalition favors.

Paragraph 2 grants the modifications to 9–3 necessary to implement Mixed Feeder I and the CHOICE plan. The court does not, however, rubberstamp the Red Clay plan or the State Board order. Rather, the court's Order imposes additional conditions and requirements upon the implementation of CHOICE in the hopes of curing some of the deficiencies in the plan made evident at trial. While the Red Clay District will be allowed to implement its CHOICE plan, it will do so only under the close supervision of the State Board. The order warns that failure on the part of the Red Clay District or the State Board to satisfy all requirements of the court's Order will result in withdrawal of the court's approval of the necessary modifications and a return to the 9–3 requirement for all Red Clay students.

Paragraph 2.b.(i) describes the CHOICE plan for which the modification is granted. The State Board lent its support to the CHOICE plan contained in RC–30 only if it is fully implemented and funded. The court does the same. Consequently, the modifications to 9–3 granted in the order do not extend to any "scaled down" versions of CHOICE nor to any "scaled down" versions of the magnet component. At the request of Red Clay, the court will not withdraw its approval of the modifications necessary for implementation of CHOICE at the high school level if all or part of the necessary funding is received from a source other than the federal Magnet Schools Assistance Program. However, such non-federal funding must be received by Red Clay no later than July 1, 1991. At the elementary school level, approval of the necessary modifications will be withdrawn if the District does not receive funding from the Magnet Schools Assistance Program (see para. 2.c.(i)).

Paragraphs 2.b.(ii)–(v) are designed to remedy several of the deficiencies in the CHOICE plan which were raised at trial. Paragraph 2.b.(ii) ensures that the District will not avoid its duty to desegregate Wilmington High School by maintaining a ra-cial balance of +/− 10% while allowing Wilmington High School's enrollment to decrease until it ceases to be a viable high school. Consequently, the modifications to 9–3 which enable implementation of CHOICE are granted only for so long as the enrollment at Wilmington High School at each grade level in which CHOICE is implemented is not less than 25% of the District enrollment at that grade level.

At trial, plaintiffs raised questions as to whether the CHOICE plan unequivocally committed to the desegregation goal of +/− 10%. Paragraph 2.b.(iii) addresses this concern by granting the modifications only for so long as the District maintains +/− 10% of enrollment by race of the District for grades 9–12 in each high school at every grade level in which CHOICE is implemented. The court notes that paragraph 2.b.(iii) does not violate the Supreme Court's admonishment that federal courts should not impose racial quotas upon school districts. *E.g., Milliken v. Bradley*, 418 U.S. 717, 741 n. 19, 94 S.Ct. 3112, 3125 n. 19, 41 L.Ed.2d 1069 (1974). Implementation of the CHOICE plan as it was presented to the court would not amount to imposition of racial quotas by a federal court. The District came to this court and offered this plan, including its previously adopted desegregation goal of +/− 10%, as justification for modification of the centerpiece of this court's previous desegregation orders. The District of its own accord adopted a target at each school of +/− 10% from the average minority population of the District at each grade level. It is entirely within the District's authority to do so:

> School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities....

*Swann v. Charlotte–Mecklenburg Bd. of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267,

1276, 28 L.Ed.2d 554 (1971). The court granted the modification based upon the representations presented in the CHOICE plan, including the District's representations that implementation of CHOICE would achieve the +/− 10% target the District set for itself. The plaintiffs presented significant evidence that the District should not be taken at its word. Paragraph 2.b.(iii) merely assures that the CHOICE plan which justifies modification of the court's orders is in fact the CHOICE plan which is implemented by the District.

More than one witness noted that the CHOICE student assignment component lacked fully developed mechanisms for certain events which may prove likely. These include the possibility that some students may fail to fill out a CHOICE form altogether or that some may fill it out incorrectly, such as by designating fewer than four different high school program choices. There were also no mechanisms designed to assign students who enter the District after completion of the student assignment process and no clear policy for the assignment of students who "change their minds" at some point and desire to transfer out of a program. Paragraphs 2.b.(iv) and (v) are designed to address these deficiencies by requiring the Red Clay District to develop mechanisms for addressing these possibilities no later than February 15, 1991 or a later date set by the State Board and by requiring the State Board to notify the court by written pleading whether it deems the mechanisms submitted by Red Clay acceptable.

Paragraphs 2.b.(vi)–(xiii) incorporate in part certain provisions of the December 20, 1990 State Board order. Paragraph 2.b.(vi) requires Red Clay to submit a backup plan or to inform the State Board that it will implement Mixed Feeder II as the backup by March 1, 1991 or a later date set by the State Board. Paragraph 2.b.(vi) also prohibits Red Clay from submitting a backup plan with a "choice" or magnet component and orders that the backup plan must not require deviations from 9–3 other than the deviations granted in paragraph 2.a. of the court's Order. Unlike the December 20, 1990 State Board order, Paragraph 2.b.(vi)

does not contain a default provision. The Red Clay Board must take affirmative action with regard to the backup plan in order to comply with Paragraph 2.b.(vi). The court deliberately omitted the default provision provided by the State Board. While the State Board is to be commended for proceeding toward September 1991 implementation by providing for a backup plan in the event of inaction by the Red Clay Board prior to March 1, 1991, inaction by the Red Clay Board has the potential effect of that Board's abdicating its responsibility by doing nothing. This may well be what the Red Clay Board determines to do given the trial testimony that three members of that Board prefer to maintain the status quo if CHOICE does not receive adequate funding. Nonetheless, the consequences of an abdication by the Red Clay Board of its responsibility to eliminate the vestiges of *de jure* segregation are so far reaching that abdication should occur by affirmative act of the Red Clay Board. The court hopes the Red Clay Board will change its mind and not embark on such a disastrous path. If it does abdicate its constitutional responsibility, its commitment to successful implementation of CHOICE is in grave doubt. As a consequence, there would be no alternative for the court but to withdraw its approval of the modification of 9–3 necessary to implement CHOICE should Red Clay fail to submit timely an acceptable backup plan. It is only due to the State Board's order that the racial disparities in the Red Clay schools will be addressed in September 1991 regardless of whether CHOICE receives funding. The Red Clay Board must either affirmatively face up to its responsibilities and to its previous commitments to this court by ensuring, without an order by the State Board, that the racial disparities in the Red Clay Schools will be eliminated in September 1991 or else lose the modification to 9–3 necessary for it to implement CHOICE.

Paragraph 2.b.(vii) requires the State Board to notify the court by written pleading within five days of the first State Board meeting conducted subsequent to

the last date for Red Clay to submit a backup plan whether the Red Clay Board timely submitted an acceptable backup plan or notified the State Board that it intends to implement Mixed Feeder II as the backup plan. In the event the Red Clay Board does not submit an acceptable backup plan or notify the State Board of its intent to implement Mixed Feeder II as the backup plan, the State Board shall contemporaneously move for a court order withdrawing the modifications of 9–3 necessary to implement both the elementary and high school components of CHOICE granted in Paragraph 2.b. and 2.c. of the court's Order. If the Red Clay Board fails to abide by Paragraph 2.b.(vi), the State Board is also ordered to order for September 1991 implementation such student assignments in the Red Clay District as it deems necessary to remedy the racial disparities in the Red Clay schools.

Paragraph 2.b.(viii) incorporates paragraphs 5(c), 5(d), and 6 of the State Board's December 20, 1990 order. Paragraph 2.b.(ix) orders the State Board to inform the court whether the Red Clay Board has satisfactorily complied with Paragraph 2.b.(viii), and if not, whether approval of the modification granted in Paragraph 2.b. should be withdrawn and the Red Clay Board should be ordered to implement the backup plan.

Paragraphs 2.b.(x) and (xi) incorporate Paragraph 7 of the State Board's December 20, 1990 order which requires certain administrative tasks necessary for implementation of CHOICE to be completed before July 31, 1991. In its Order, the court has eliminated the State Board's requirement of federal funding and permitted Red Clay to continue implementation of CHOICE if it receives alternative funding prior to July 1, 1991. Paragraph 2.b.(xi) requires the State Board to inform the court on or before August 15, 1991 whether Red Clay has complied with Paragraph 2.b.(x) of the court's Order.

Paragraphs 2.b.(xii) and (xiii) incorporate Paragraph 8 of the State Board's December 20, 1990 order regarding the steps the Red Clay District must take to implement a successful parent outreach program. Paragraph 2.b.(xiii) requires the State Board to inform the court on or before May 1, 1991 whether Red Clay has timely complied with Paragraph 2.b.(xii).

Paragraphs 2.b.(xiv)–(xviii) are designed to ensure that the CHOICE plan is implemented under the supervision of the State Board by supplementing the reports which the District must generate in compliance with the court's prior desegregation orders. Paragraphs 2.b.(xiv) and (xv) are designed to keep track of whether the panacea of CHOICE does in fact result in voluntary desegregation of the high schools. It is also hoped that generation of these reports will enable the State Board and the court to monitor whether the Red Clay Board is implementing the student assignment component of CHOICE in a fair and equitable manner.

Paragraphs 2.b.(xvi)–(xvii) are intended to address the Substantive Problems. The Substantive Problems are vestiges of past discrimination, the eradication of which will be necessary for the District to free itself of the effects of prior segregation to the greatest extent practicable. It is hoped that the requirements of paragraphs 2.b.(xvi) and (xvii) will enable the District, the State Board, and the court to monitor the District's progress toward that end and to further address these problems.

Paragraph 2.b.(xviii), in accordance with the colloquy which occurred at pages 452–53 of the Transcript of the January 2–11, 1991 hearing, orders the District to locate a parent information center at either the Hilltop Center or the Lewis Elementary School so as to be more accessible to minority parents.

Paragraph 2.c. conditionally, grants the modifications to 9–3 necessary to implement a magnet school program at Baltz Elementary School. The court is sensitive to the fact that the Baltz magnet is included in the federal Magnet Schools Assistance application and hesitates to sabotage the application by denying approval of the modifications necessary for the elementary magnet. At the same time, the elementary magnet is at this point merely a concept.

Red Clay has not met its burden of giving the court a good reason to modify its previous orders. As a result, the modification for Baltz is approved *only* if the District receives Magnet Schools Assistance Program funding (para. 2.c.(i)) and then only after the Red Clay District has developed a complete plan from the concept and that plan has met with the approval of the State Board. If federal Magnet Schools Assistance Program funding is not obtained, the modifications necessary to implement the elementary magnet are not granted. The Red Clay Board would not be prohibited, however, from coming forward at some future date to request approval for a fully developed elementary magnet plan.

Paragraph 3 requires the Red Clay Board to report its progress on resolving the Substantive Problems to the State Board on or before June 30 of each year regardless of which student assignment plan is implemented in the District. The State Board is required to notify the court by written pleading whether the Red Clay District is making progress in resolving the Substantive Problems.

Paragraph 4 declares that the CHOICE plan as set forth in RC–30 and modified by the court's Order and the December 20, 1990 order of the State Board, if implemented properly, would comply with this court's desegregation orders.

Paragraph 5 treats the modifications granted in Paragraph 2 as continued modifications granted each school year rather than as permanent exemptions from 9–3. Consequently, while it will not be necessary for the District to return to the court each year to seek approval for implementation of CHOICE the following year, the burden will remain on Red Clay with respect to the modifications necessary to implement CHOICE to demonstrate that such modifications are justified.

CONCLUSION

In 1981, this court set forth the test for modification of its desegregation orders prior to a finding that an individual district has achieved eradication of the vestiges of *de jure* segregation:

Will the proposed modification in the system of organization of the public schools permit the effective continuance of the transition to a unitary school system and the elimination of the vestiges of *de jure* segregation? If the evidence adduced ... persuades the Court that the answer is yes, then the Court will be obliged to permit [implementation of the proposed change].

*Evans v. Buchanan,* 512 F.Supp. 839, 850–51 (D.Del.1981).

The Red Clay Consolidated School District is the most troubled of the four districts in the desegregated area. It is a polarized community, at odds with itself, primarily because of a lack of commitment to eradication of the vestiges of *de jure* segregation. Feeder pattern assignments in accord with the 9–3 requirement have not succeeded. Unlike proposed realignment of feeder patterns which have been a magnet for controversy in the District, CHOICE was able to attract the unanimous support of the Red Clay Board. Moreover, whereas the Red Clay Board spent six years dickering over feeder pattern changes, it was able to transform a CHOICE concept into a plan within a year's time.

The court, based upon Red Clay's inaction over a six-year period of time, has serious reservations about the commitment and good faith desire of the Red Clay Board to eliminate the vestiges of *de jure* segregation. However, the court believes that CHOICE shows some promise. The court also believes that the State Board and the officials at the Department of Public Instruction have acted in good faith. While the District authorities may or may not have abdicated their responsibility to ensure that the Red Clay District becomes free of prior segregation, the State Board has not.

Plaintiffs label CHOICE an "intellectual exercise." And so it is. The 9–3 plan, however, was also nothing more than an intellectual exercise in 1978. The 9–3 requirement is an intellectual exercise, implementation of which moved three school districts toward desegregation and failed in

one. The Red Clay Board blames many things for this failure—the District's size, the broad array of diverse communities within its borders, the substantial numbers of private schools located in the District, and the large number homeless children in Red Clay. RC–30. The Board in fact blames everything but its own failure to commit to eradication of *de jure* segregation and to generate support in the community for this objective.

The court notes that the dissenting Board members, Cavanaugh and Reinbold, one of whom was apparently fighting to remedy racial disparities in the District as early as August 1987, *see* PX–1–17, voted for CHOICE. The State Board saw promise in the plan. While the court finds many deficiencies in the CHOICE plan, it believes that the State Board and Red Clay should not be stymied in innovative initiatives, the purpose of which, *inter alia,* is to move the Red Clay District toward compliance with the fourteenth amendment. Consequently, the court, though not without some reluctance, adds its imprimatur and finds that the CHOICE proposal satisfies the test the court set in 1981. The court is aware that plaintiffs fear losing a victory they feel they have obtained in this lengthy litigation. The plaintiffs should rest assured that if the Red Clay Board fails to act with good faith in implementing CHOICE, the plaintiffs may return to this court and the Red Clay Board—not the plaintiffs—will bear the burden of demonstrating that CHOICE is deserving of continued modification of the court's prior orders.

## APPENDIX A

### ORDER

At Wilmington, this 1st day of February, 1991, and for the reasons set forth in the Opinion issued this date, IT IS HEREBY ORDERED:

1. The Plaintiffs' "Motion for the Entry of an Order Directing...." (Dkt. 1294), except insofar as it is addressed by the remainder of this Order, is denied.

2. The Motion of the Red Clay Consolidated School District for Deviations from Prior Court Orders (Dkt. 1304) ("the Red Clay Motion") is granted pursuant to the following terms and conditions:

a. That portion of the Red Clay Motion seeking, on a one-time only basis, a deviation from the requirement that students spend at least three years in the schools in the former predominantly black district for students entering grades 2 and above in the school year 1991–92 and residing in the two city grids, numbered 104/358 and 110/360, where the assignment to schools in the former predominantly black district has been changed under the mixed feeder reassignment plan from grades 9–12 to grades 1–3 is granted.

b. That portion of the Red Clay Motion seeking a modification of the Court's prior desegregation orders to exempt those high school students who have not attended a school in the former predominantly black district during grades 1–8 and who, pursuant to implementation of the District's CHOICE plan, receive a high school assignment other than Wilmington High School from the requirement that all students attend a school in the former predominantly black district for at least three years, is granted pursuant to the following conditions. Failure to satisfy any of these conditions at any time will result in withdrawal of the Court's grant of modification of its prior desegregation orders and a return to the requirement that all students in the Red Clay District spend at least three years attending a school in the former predominantly black district:

(i) The modification is granted to enable the District to implement its CHOICE proposal as described in its December 14, 1990 Magnet Schools Assistance Program application (RC–30) and as modified by the December 20, 1990 order of the State Board and as further modified by this Order. As the CHOICE proposal described in RC–30 is a plan which includes a fully funded magnet component, the modification is conditioned upon the receipt by the District of full funding, that is $6.07 million over a two-year period from any source. However, if the source of part or all of such funding is other than the federal Magnet

Schools Assistance Program, such funding must be received no later than July 1, 1991.

(ii) The modification is granted only for so long as the CHOICE plan is implemented in such a way as to further the Red Clay Consolidated School District's ("Red Clay District") progress toward eradication of the vestiges of prior discrimination. Toward that end, the modification is granted only for so long as the population at Wilmington High School in each grade level at which CHOICE is operative is not less than twenty-five percent (25%) of the total District enrollment at that grade level on September 30 of each year.

(iii) The modification is granted only for so long as the Red Clay District maintains at all four high schools the desegregation goal it set for itself in its CHOICE proposal, that is, an enrollment by race in each grade at which CHOICE is operative of $+/-$ 10% of the enrollment by race of the District for grades 9–12.

(iv) The Red Clay District is ordered to devise and present to the State Board of Education for the State of Delaware ("State Board") no later than February 15, 1991 or a later date to be set by the State Board, (a) a complete and detailed student assignment mechanism for students who fail to fill out a form designating their four high school programs of choice either in total or by designating fewer than four different high school programs, (b) a complete and detailed student assignment mechanism for those students who enter the District subsequent to the deadline for submission of choice forms by the students, and (c) a complete and detailed policy describing assignment of those students who "change their minds" about their selections prior to final assignment processing, subsequent to final processing, and during the school year and who desire to transfer out of a particular program.

(v) The State Board is ordered to inform the Court by written pleading on or before May 1, 1991 whether it deems the submission by the Red Clay District set forth in Paragraph 2.b.(iv) to be satisfactory in terms of its educational soundness, its fair and equal treatment of all students, and its impact upon the desegregation goals of the CHOICE plan. If the State Board is not satisfied with the submission as set forth above, it shall recommend to the Court whether the modification of 9–3 granted in Paragraph 2.b. should be withdrawn.

(vi) The Red Clay District no later than March 1, 1991 or another date selected with the concurrence of the State Board shall submit to the State Board an acceptable and completely described backup plan for September 1991 implementation in the event it fails to receive full federal funding or to secure alternative funding prior to July 1, 1991 or to inform the State Board that it will implement Mixed Feeder II as the backup plan. The backup plan shall not include a "choice" or magnet component and shall not require any of the deviations from prior desegregation orders with the exception of the deviation granted in Paragraph 2.a. of this Order. The Red Clay Board is on notice that it must take affirmative action with regard to the submission of a backup plan in order to satisfy this condition of the Order. Failure affirmatively to submit in a timely manner a backup plan or expressly notify the State Board that the backup plan will be Mixed Feeder II will be considered a failure to fulfill the conditions of this Order and will result in the modification granted in Paragraph 2.b. to be withdrawn.

(vii) The State Board is ordered to notify the Court by written pleading within 5 days of the first State Board meeting conducted subsequent to the last date for Red Clay to submit a backup plan whether the Red Clay Board timely submitted an acceptable backup plan or notified the State Board that it intends to implement Mixed Feeder II as the backup plan. In the event the Red Clay Board does not submit an acceptable backup plan or notify the State Board of its intent to implement Mixed Feeder II as the backup plan, the State Board is ordered to move immediately for a court order withdrawing the modifications of 9–3 granted in Paragraphs 2.b. and 2.c. of this Order. In the event of default by the Red Clay Board, the State Board is further ordered to order for September 1991 imple-

mentation such student assignments in the Red Clay District as it deems necessary to remedy the racial disparities in the Red Clay schools.

(viii) The Red Clay District shall have in place by April 15, 1991 or a later date set by the State Board, plans sufficiently developed to ensure the implementation of both its CHOICE plan and its approved backup plan or Mixed Feeder II, as if proceeding to a September 1, 1991 implementation. By "plans sufficiently developed" the Red Clay District shall submit to the Department of Public Instruction by April 15, 1991, or a later date set by the State Board, evidence that for school year 1991–92 it has as to both CHOICE and the backup or Mixed Feeder II:

(a) Completed all course descriptions for the magnet programs and that those descriptions have been distributed to all students who are able to participate in CHOICE, and that these students have been notified of their Mixed Feeder II, or alternative backup plan, school assignment should CHOICE not be funded;

(b) Completed the students' initial CHOICE school/program/course selection process and the computer sorting of those selections;

(c) Determined the number of students, and the percentages by race of those students, in each school and program for both the CHOICE plan and for the Mixed Feeder II, or the alternative backup plan (subject to *minor* changes to account for new enrollments, etc. over the summer);

(d) Determined the racial composition of tentaive staff assignments by school for both the CHOICE plan and for the Mixed Feeder II, or the alternative backup plan (subject to *minor* changes to account for new enrollments, etc. over the summer);

(e) Determined the initial description of proposed bus routing and estimated costs under the CHOICE plan and for the Mixed Feeder II or the alternative backup plan necessary to be able to make bus assignments by August 15, 1991;

(f) Determined a plan for staff development for both the CHOICE plan and for the Mixed Feeder II plan or the alternative backup plan.

(ix) The State Board shall inform the Court by written pleading on or before May 1, 1991 whether the Red Clay District has satisfied the requirements of Paragraph 2.b.(viii) and whether the modification granted in Paragraph 2.b. of this Order should be withdrawn and the Red Clay Board should be ordered to implement the backup plan in accordance with Paragraph 5(d) of the State Board's Order of December 20, 1990 for failure to have in place sufficiently developed plans to ensure implementation of CHOICE in September 1991 as described in Paragraph 2.b.(vii) above.

(x) If the CHOICE plan is fully funded at the high school level either by the Magnet Schools Assistance Program or through alternative funding received no later than July 1, 1991, and the District has met the requirements described in this Order which it would be required to meet prior to July 1, 1991, the District may proceed with its CHOICE plan on the condition that it submits evidence to the State Board that it has in place by July 31, 1991 the following:

(a) An established master schedule of all student course selections and assignments for all high schools, so that final course scheduling can be completed no later than August 15, 1991;

(b) Written curriculum guides for all new or modified courses being implemented in each high school;

(c) All staff assignments for each high school;

(d) All transportation routing and plans, so that students may be notified on or before August 15, 1991 of a description of the transportation plan and their individual assignments.

(xi) On or before August 15, 1991, the State Board shall inform the Court by written pleading whether the Red Clay District has satisfied the requirements of Paragraph 2.b.(x).

(xii) The Red Clay District is ordered to submit to the State Board with regard to CHOICE by April 1, 1991 or another date set by the State Board evidence that the District has effectively implemented a community outreach plan in which the District at least has done the following:

(a) Disseminated to every eligible student and his or her parent or guardian information regarding the magnet programs and the CHOICE process sufficient to make an informed program selection;

(b) Met with key community leaders to explain the CHOICE program, student options and educational benefits;

(c) Held a series of meetings at the Parent Information Centers, at the Latin Community Center, and at other locations, including those within the minority communities in the District, to explain the CHOICE program, student options, and the educational benefits;

(d) Scheduled and held counselor/student/parent meetings to ensure that students and their parents understand the full range of CHOICE options, and have had assistance in the preparation of forms.

(xiii) The State Board is ordered to inform the Court by written pleading on or before May 1, 1991 whether the Red Clay Board has satisfied the requirements of Paragraph 2.b.(xi).

(xiv) The Red Clay District is hereby ordered to report to the State Board no later than September 30 of 1991 and each year thereafter in which the CHOICE plan remains operative in a format established by the State Board, the number of students by race who (a) select each of the eight high school programs as their first choice, (b) select each program as their second choice, (c) select each program as their third choice, (d) select each program as their fourth choice, and (e) whether any mandatory assignments were made in order to maintain the desegregation goal of $+/-$ 10% and if so how many students, by race, were assigned and to which programs they were assigned. The Red Clay Board shall forward a copy of these reports to Plaintiffs.

(xv) The State Board is ordered to inform the Court by written pleading on or before November 15, 1991 and each year thereafter in which the CHOICE plan remains operative whether the student assignment process under CHOICE was carried out in such a way as to achieve the desegregation goal of $+/-$ 10% set by the Red Clay District and the State Board and whether the student assignment process, especially with respect to any mandatory assignment of students into a program which was not among their four choices, has been carried out in a non-discriminatory manner.

(xvi) The Red Clay District is ordered to report to the State Board no later than June 30, 1992 and each year thereafter in which CHOICE is operative in a format established by the State Board, its progress toward achievement of the objectives it set for itself on pages 39–45 of its December 14, 1990 Magnet Schools Assistance Program application (RC–30). In addition, the Red Clay District must report its progress toward remedying at the high school level the racial disparities in dropouts, suspensions, attendance, assignments to special education classes, test scores, matriculation to college, and staff composition. The Red Clay District shall forward a copy of these reports to the Plaintiffs.

(xvii) The State Board shall inform the Court by written pleading on or before July 15, 1992 and each year thereafter whether the Red Clay District's CHOICE plan is making progress toward achievement of the goals set which the Red Clay District set for itself at pages 39–45 of its December 14, 1991 Magnet Schools Assistance Program application (RC–30) and whether it has made progress toward reducing the racial disparities in dropouts, suspensions, attendance, assignments to special education classes, test scores, matriculation to college, and staff composition.

(xviii) The Red Clay District is ordered to locate a parent information center on CHOICE either at the Lewis Elementary School or the Hilltop Center in accordance

with the representations made by Red Clay's counsel at the January 2–11, 1991 hearing. Tr. 452–53.

c. A modification of the prior desegregation orders exempting those students who elect to attend the magnet program at Baltz Elementary School during those years when they ordinarily would have attended for three consecutive years at a school in the former predominantly black district and who thereafter pursuant to the CHOICE program receive a high school assignment other than Wilmington High School from the requirement that they spend at least three consecutive years attending a school in the former predominantly black district is granted with the following conditions. Failure to satisfy any of these conditions at any time will result in withdrawal of the Court's grant of modification of its prior desegregation orders and a return to the requirement that all students in Red Clay District spend at least three years attending a school in the former predominantly black district except as provided by the modification granted at Paragraph 2.b.

(i) The modification in Paragraph 2.c. is granted only if the Baltz magnet proposal receives federal funding from the Magnet Schools Assistance Program. The modification is not granted if the District receives sufficient alternate funding to implement its CHOICE proposals at the high school level.

(ii) In the event federal funding to implement the elementary magnet is received from the Magnet Schools Assistance Program, the Red Clay District shall submit to the State Board no later than November 15, 1991 a complete and detailed student assignment plan involving the magnet programs at Baltz. Such plan must include, but is not limited to, the relocation of the students currently attending or projected to attend Baltz under the mixed feeder assignments, the effect of such relocation on the racial balances at the receiving schools, a sample application for elementary students wishing to enroll in the magnet programs at Baltz, a detailed description of the assignment procedure, including the factors which will be considered in the event of oversubscription or undersubscription by students of a particular race, a fully developed and detailed curriculum, a plan for staff training and assignment, and a detailed plan for ensuring that students will have equal access to the Baltz program and that students whose parents are more active in the schools will not be advantaged. The report to the State Board should include projections by race and by grade as to the number of students likely to be affected by implementation of the magnet programs at Baltz and the number of students likely to require an exemption from the court's prior desegregation orders.

(iii) The State Board is ordered to inform the Court by written pleading on or before January 15, 1992 whether it is satisfied with all aspects of the Baltz programs including the impact upon progress toward eradication of the vestiges of prior segregation relative to the value of the program in terms of educational enhancements and likely reduction in racial disparities both at Baltz and in all other elementary schools in the Red Clay District.

3. Regardless of whether CHOICE is implemented, the Red Clay District is ordered, on June 30, 1991 and each year thereafter until further order of the Court, to report its progress toward remedying at the high school level the racial disparities in dropouts, suspensions, attendance, assignments to special education classes, test scores, matriculation to college, and staff composition. The Red Clay District shall forward a copy of these reports to the Plaintiffs. The State Board shall inform the Court by written pleading on or before July 15, 1992 and each year thereafter until further order of the Court whether the Red Clay Consolidated School District has made progress toward reducing the racial disparities in dropouts, suspensions, attendance, assignments to special education classes, test scores, matriculation to college, and staff composition.

4. It is decreed that Red Clay's CHOICE plan as described in the Decem-

ber 14, 1990 application to the Magnet Schools Assistance Program entitled "A Proposal to Eliminate Racial Isolation by the Implementation of a Voluntary Desegregation Plan Using Magnet Programs" as modified by the December 20, 1990 order of the Delaware State Board of Education and as further modified by the provisions of this Order would, if implemented properly, be in compliance with this Court's desegregation orders.

5. The Court will continue to retain supervisory jurisdiction in this case until such time as it finds that the vestiges of prior segregation in the schools in the Red Clay Consolidated School District have been eradicated to the greatest extent practicable, and the burden will remain on the District to show that the modifications granted in this Order remain warranted in future years.

/s/ <u>Murray M. Schwartz</u>
United States District Judge